[No. B241552. Second Dist., Div. Three. Oct. 29, 2012.]

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
Y.G. et al., Real Parties in Interest.

14

**COUNSEL**

John F. Krattli, Acting County Counsel, James M. Owens, Assistant County Counsel, Sabrina Eslamboly, Principal Deputy County Counsel, and Melinda S. White-Svec, Deputy County Counsel, for Petitioner.

No appearance for Respondent.

No appearance for Real Parties in Interest.

Ronnie Cheung and Sumako McCallum for Minor.

**OPINION**

**ALDRICH, J.—**

## INTRODUCTION

The juvenile court dismissed with prejudice a dependency petition seeking to have Cesar G. declared a dependent of the juvenile court on the ground, inter alia, 20-month-old Jasmine G. died while in the custody of Cesar's

father, Jaime A. (Welf. & Inst. Code, § 300.)[1] The Los Angeles County Department of Children and Family Services (the Department) seeks a writ of mandate to set aside the juvenile court's dismissal order. We conclude the court erred in declining to take jurisdiction over Cesar under section 300, subdivision (f). Accordingly, we grant the petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The section 300 petition*

The Department alleged among other things that Cesar G. (then two months old) was at risk because on August 8, 2009, then 20-month-old Jasmine G. (the toddler) died from dehydration and internal bleeding from a fractured liver as the result of blunt abdominal trauma sustained while she was under the supervision of Cesar's father, Jaime A., and Cesar's half sister, Jocelyn G. The toddler's death is being investigated as a murder. The Department alleged that *Jaime caused the toddler's death through abuse or neglect.* (§ 300, subd. (f).)

### 2. *The parties' relationships*

In view of the unusual liaisons among the various parties, we preliminarily address the family relationships.

   a. *Jocelyn G. is the toddler's mother and was herself a dependent of the court because of abuse and neglect by her mother, the toddler's maternal grandmother, Y.G.*

At the time of the toddler's death, her mother, Jocelyn G. (born in 1993), was a 16-year-old dependent of the juvenile court because of physical injuries caused by the abuse perpetrated by Y.G., Jocelyn and Cesar's mother and the toddler's grandmother. Jocelyn was hospitalized for airway and throat injuries, fracture of the left femur and massive hematoma under the tongue. The juvenile court granted Y.G. monitored visits with Jocelyn and Jocelyn's four siblings.[2] In December 2010, the juvenile court returned Jocelyn's siblings to Y.G.'s custody after Y.G. completed all of the court's orders. However, Jocelyn remained in foster care.

   b. *Jaime A. and Jocelyn G., and Jocelyn's other child Jason G.*

Jaime A. (born in 1991) lived with his mother and his siblings until August 8, 2009, the day of the toddler's death, when he was asked to leave his mother's home. As of June 8, 2011, Jaime was "living with a friend."

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise specified.

[2] Jocelyn's siblings are not parties to this proceeding.

Eleven days after the toddler's death, Jocelyn G. gave birth to Jason G. Jaime A. is Jason's alleged father. The Department filed a petition pursuant to section 300, subdivisions (a), (b), (f), and (j) on behalf of Jason. As of September 30, 2009, Jason was in foster care. The juvenile court denied reunification services for Jocelyn and set a permanent plan hearing for Jason.

c. *Jamie A. and Y.G.'s son Cesar G.*

Cesar G., as noted, is the subject of the petition at issue. At some point, the toddler's maternal grandmother, Y.G., and Jamie A. became intimate, and Cesar was born 18 months after the toddler's death. The juvenile court declared Jaime to be Cesar's presumed father. That is, Cesar, the subject of this appeal, is the result of the relationship between the toddler's maternal grandmother, Y.G., and the toddler's mother's ex-boyfriend, Jaime. Y.G. and Jaime do not reside in the same household, but she desires to maintain a relationship with him. Y.G. acknowledged that Jaime is a suspect in the toddler's murder but told the Department she believed Jaime was innocent. Were it not for "this problem," she and Jaime would be living together. They have "a lot of plans for the future."

d. *Jaime A.'s care of the toddler in the days immediately preceding her death*

The toddler was pronounced dead at 3:04 a.m. on August 8, 2009. Jaime A. was one of her main, regular caretakers in the three days, and especially the 12 hours, before the toddler died from her injuries. He testified that he took care of the toddler. According to the toddler's daycare provider, Jaime regularly picked the toddler up and dropped her off at daycare. There was only one day that Jaime did not accompany Jocelyn G. to daycare.

On the afternoon before her death, Jaime A. was with the toddler from around 1:25 p.m. when he picked her up at daycare until around 7:00 p.m. when he put her to bed. Jocelyn G. was also with the toddler for much of that time. Jaime recounted that from daycare, Jaime and Jocelyn took the toddler to Jocelyn's doctor's appointment and then to Jocelyn's foster home where Jaime waited outside for over an hour while Jocelyn was alone inside with the toddler. Around 6:00 p.m., Jaime's mother took him, Jocelyn, and the toddler back to Jaime's family's house. Around 6:30 p.m., Jocelyn left to sell Avon products in the neighborhood, leaving Jaime as the toddler's sole caretaker. He testified he put the toddler to bed about 7:00 p.m. the evening of August 7, 2009, about eight hours before she died. Thus, Jaime was with the toddler from 1:25 p.m., when he picked her up, until 7:00 p.m., when he put her to bed, with the exception of one hour when Jocelyn had the toddler alone in her foster home. The toddler died eight hours later.

e. *The toddler's death*

According to the autopsy report, the toddler died because of "blunt abdominal trauma," being "beaten," and "being punched in the abdomen by an adult abuser," which caused bleeding from the fractured liver. By the time she died, the toddler had almost no blood in her veins as it had all gone to her abdominal cavity and retroperitoneum. In the opinion of the coroner, "[t]his fatal process took one to three days to cause death. . . . *The child suffered a slow and painful death from dehydration and internal bleeding whose symptoms were concealed by her caregivers.*" (Italics added.)

The coroner testified that the toddler suffered bleeding into her abdomen over a period of hours to days and dehydration because the abdominal pain would have inhibited her ability to digest food and fluid. Not only did she suffer a slow death, but the process was very painful because the toddler had bruises to all of her abdominal organs, which organs are sensitive to pain. She also had a broken rib, which is quite painful. Although the toddler's behavior would have been "strongly conditioned by the family environment," among the symptoms the toddler would have exhibited, the coroner testified, would have been *pain, resistance to feeding* because the pain would make a person lose his or her appetite, *irritability* because of the developing shock, restlessness and becoming pale, and then exhibit *increasing somnolence, less activity* and less responsivity, and finally *complete silence* over a period of hours.

According to the coroner, "*any reasonable person [would] have known that this child was ill*" because her body was covered with bruises and her abdomen was distended from all the blood flowing into it, she had an obvious bite mark on the shoulder and a kick mark on the left flank. (Italics added.) Also, the toddler may have been vomiting, and at her age, *it would have been obvious she was not normal but was in pain.* As she went into shock and became less and less active and *increasingly somnolent*, it would be *obvious* that she was *very ill.* The toddler suffered "severe and extremely painful injuries," the coroner testified, and so "[i]t would be obvious right away." "I don't see how a one and a half year old can act or look normal after having received fatal injuries."

Dr. Carol Berkowitz, an expert for the Department, opined the injuries that caused the toddler's death occurred within 12 hours of the toddler's demise. With the injuries she sustained, the toddler would *not have exhibited a normal level of activity*. Rather, she would have had severe pain in her abdomen because blood acts as an irritant. *She would not have wanted to move.* She may have rolled up into a ball trying to hold herself still. She would have cried or moaned. Dr. Berkowitz believed that with the kind of abdominal trauma the toddler sustained, *her caretakers would have known that she needed immediate medical care.*

No family member claimed to have seen anything and insisted that the investigating social worker talk to their attorneys. Jocelyn G. did not explain how the toddler sustained her fatal injuries and remains a suspect in the death. Jaime A., who is also a person of interest in the police investigation, told the Department he had no explanation for the injuries.

Nonetheless, Jaime A. did notice the toddler exhibited symptoms both medical experts described. He regularly cared for the toddler and knew her eating and sleeping schedule. Jaime testified the toddler was normally "really playful," "active," could walk, and was a good eater and easy to put to sleep at night, although she was a light sleeper. By comparison, on the evening before the toddler's death, Jaime tried to feed her sometime after 6:00 p.m., but she did not finish. He testified she was "bored," "acting lazy," and "looked sleepy," "tired," and "sad." He took the toddler outside to wear her out and put her to sleep. *He testified he guessed she was not feeling well.*

Jaime A. put the toddler to bed around 7:00 p.m. or 7:30 p.m., he testified. When he checked on her about 30 minutes later, he felt her stomach and found she was " 'breathing good.' " Around 2:50 in the morning of August 8, 2009, Jocelyn G. found the toddler's body was cold; Jaime noted the toddler was not breathing. The police arrived around 2:58 a.m., by which time the toddler was dead and stiff. Photographs from the scene showed *multiple bruises on the toddler's abdomen.*

### f. *The petition naming Cesar G.*

The petition seeks juvenile court jurisdiction over Cesar G. based on the risk to him, in part, because his father Jaime A. had caused the death of another child, namely the toddler, through abuse or neglect (§ 300, subd. (f)). At the close of the lengthy contested jurisdictional hearing, the juvenile court dismissed the petition with prejudice over the objections of the Department. The court also denied the Department's request for a stay of that ruling. The Department filed the instant petition for writ of mandate seeking an order directing the juvenile court to vacate its order dismissing the section 300 petition and to enter a new order sustaining that petition and permitting Jaime only monitored contact with Cesar. We issued an order to show cause to the parties to address why a peremptory writ should not issue and stayed the proceedings in the juvenile court.

## CONTENTIONS

The Department contends the juvenile court erred in dismissing the section 300 petition. Cesar G. contends there is no evidence to support juvenile court jurisdiction.

## DISCUSSION

■ " ' "The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child . . . comes under the juvenile court's jurisdiction." ' [Citation.]" (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185 [68 Cal.Rptr.3d 465]; see § 355, subd. (a).) On appeal from a jurisdictional order we review the record for substantial evidence and resolve all conflicts in favor of the respondent. Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re Veronica G., supra,* at p. 185.)

■ The circumstances under which the juvenile court may take jurisdiction of a child are narrowly defined. Subdivision (f) of section 300 authorizes dependency jurisdiction when "The child's parent or guardian caused the death of another child through abuse or neglect." As for the standard of negligence under section 300, subdivision (f), our Supreme Court has established that the statute "allows (but does not require) the juvenile court to adjudge a child a dependent if the court finds that the want of ordinary care by the child's parent or guardian caused another child's death." (*In re Ethan C.* (2012) 54 Cal.4th 610, 618 [143 Cal.Rptr.3d 565, 279 P.3d 1052].)

■ In addition to the usual standard of negligence in tort, "normal concepts of legal causation apply under section 300(f)." (*In re Ethan C., supra,* 54 Cal.4th at p. 618.) "One's wrongful acts or omissions are a legal cause of injury if they were a substantial factor in bringing it about. [Citations.] If the actor's wrongful conduct operated concurrently with other contemporaneous forces to produce the harm, it is a substantial factor, and thus a legal cause, if the injury, or its full extent, would not have occurred but for that conduct. Conversely, if the injury would have occurred even if the actor had not acted wrongfully, his or her conduct generally cannot be deemed a substantial factor in the harm. [Citations.] This 'but for' limitation does not apply, however, if the actor's wrongful conduct alone would have produced the harm, even without contribution by other forces. [Citations.]" (*Id.* at p. 640.)

■ The evidence here permits but one conclusion under the standard established by the Supreme Court in *Ethan C.,* namely that Cesar G. falls within the meaning of section 300, subdivision (f). Both the coroner and Dr. Berkowitz confirmed, given the severity of the injuries, that it would have been obvious the toddler was in pain and very ill and that she needed immediate medical care. The visible evidence was that her body was covered with bruises; she had bite marks; there was a kick mark on her left flank; and her belly was distended in a way that would be noticeable to those who knew her. The behavioral evidence was that she was not acting normally. More important, the experts testified that *had the toddler received medical attention a few hours, or possibly more, after the injury, she could have been saved.*

There is no question Jaime A. was aware that the toddler had been bitten more than once in the days leading to her death, and he saw a bruise on her stomach, and that on the night of her death, a toddler he described as normally playful, active, and a good eater was behaving noticeably differently and exactly as described by the physicians: she was "lazy," "sad," "very tired," wanted to sleep, and did not finish her dinner. Jaime admitted he thought she was not feeling well. Rather than seeking medical attention, Jaime decided to wear the child out so that the already tired-looking toddler would sleep through the night, by repeatedly grabbing the toddler and taking her outside, until she finally went to sleep. Jaime checked on the toddler after putting her to sleep by feeling her stomach but took no action despite the fact her stomach was noticeably distended. Jaime could have saved the toddler's life during the time she was in his sole care and exhibiting the obvious effects of a severe and painful injury, but he ignored these signs and took no action. Jaime's own testimony together with that of the coroner and Dr. Berkowitz lead to the only possible conclusion: that Jaime did not exercise ordinary care of the toddler, who was in his sole custody, by failing to seek immediate medical attention.

We need not resolve the question of whether Jaime A. was the adult who beat and stomped on the toddler and split her liver, or whether another adult perpetrated that act. We are not addressing criminal culpability, as it does not apply under section 300, subdivision (f) and because the standard of care and the burden of proof in dependency are lower than in a criminal proceeding. (*In re Ethan C.*, *supra*, 54 Cal.4th at pp. 629–631, 634.) The evidence in this proceeding indisputably shows that but for Jaime's failure to seek immediate medical care for this suffering child, she would not have died. Thus, Jaime was negligent, and his negligence was a substantial factor and hence a legal cause of the toddler's death.

Unlike other bases for dependency jurisdiction under section 300, "the juvenile court may adjudicate dependency under section 300(f) without any additional evidence or finding that the circumstances surrounding the parent's or guardian's fatal negligence indicate a present risk of harm to surviving children in the parent's or guardian's custody." (*In re Ethan C.*, *supra*, 54 Cal.4th at p. 618.)

As our Supreme Court observed, "it is ' "[t]he enormity of a *death*" ' of a child arising from parental inadequacy that invokes the provision[] of section[] 300 . . . . [Citation.] The Legislature has clearly provided that when one's abuse or neglect has had this tragic consequence, there is a proper basis for a finding that his or her surviving child may be made a dependent of the juvenile court . . . ." (*In re Ethan C.*, *supra*, 54 Cal.4th at p. 634.)

Because we conclude Cesar G. is described by section 300, subdivision (f) and that juvenile court jurisdiction over the child based on that statute is warranted, we need not address the remaining bases for jurisdiction alleged in the petition. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 [134 Cal.Rptr.3d 441].)

At oral argument, counsel for Y.G., who is Cesar G.'s mother and the toddler's grandmother, informed this court that Y.G. had given birth to another child, Clyde, who is also the subject of a section 300 petition. Counsel informed us that Jaime A. may be Clyde's father. Although counsel assured us that Jaime has not visited Cesar in the past six months, Jaime clearly has access to Y.G. with whom Cesar has been placed, raising the question whether Cesar is indeed safe in Y.G.'s custody.

## DISPOSITION

Let a peremptory writ issue commanding the juvenile court to vacate its order of May 29, 2012, dismissing the Welfare and Institutions Code section 300 petition as to Cesar G., and directing it to enter a new order sustaining the petition and declaring Cesar G. a dependent of the court under section 300, subdivision (f). The order staying the proceedings in the juvenile court is vacated.

Klein, P. J., and Kitching, J., concurred.