Filed 7/8/13  In re Jason S. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JASON S., a Person Coming Under the Juvenile Court Law. | B242780 (Los Angeles County Super. Ct. No. CK71927) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JASON S., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Marguerite D. Downing, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Kim Nemoy, Deputy County Counsel, for Plaintiff and Respondent.

_____

Jason S. (Father) appeals the disposition in a dependency case involving his son, also named Jason. (Welf. & Inst. Code, 395.)[1] Father is incarcerated while awaiting trial on a murder charge. Father's challenge to dependency jurisdiction fails. The evidence amply supports findings that Father is a violent person who caused the death of a minor and poses a substantial risk to Jason's health and safety.

## FACTS

Father was convicted of inflicting corporal injury on a spouse in 2007. Jason was born in December 2007, and detained by the Department of Children and Family Services (DCFS) three months later. The juvenile court sustained allegations that Jason's mother Irma J. (Mother) abuses amphetamines, used drugs and alcohol during her pregnancy, and the parents engaged in domestic violence. Father was ordered to complete a 52-week domestic violence program. Both parents exhibited signs of mental instability. Jason was placed with his paternal grandparents (PGPs).

In September 2008, Father was given custody of Jason, on condition that they both reside with the PGPs. Jason received excellent care from the PGPs, Father complied with the case plan, and dependency jurisdiction terminated in January 2009. Mother stopped visiting Jason in April 2008. Her whereabouts were unknown.

In January 2012, Father was arrested on suspicion of murder. The arrest occurred in the presence of Jason and his half-brother D., who were taken into protective custody. According to police, Father learned that his girlfriend Elizabeth I. (Elizabeth) was romantically involved with 17-year-old F.R., a popular high school athlete. Father drove to F.'s home and Elizabeth lured her lover outside. Father argued with F. about the affair, pulled out a gun and shot F. twice. D. was sitting in the car and "observed the whole incident." Father and Elizabeth fled with D. F. died of his wounds.

At the time of Father's arrest, the PGPs were Jason's primary caregivers. Though the PGPs previously asked Father to give them full custody, they did not follow through

---

[1]     Unlabeled statutory references refer to the Welfare & Institutions Code.

due to the legal costs. Jason was detained by DCFS, since neither of his parents were available to care for him, and was placed with the PGPs.

A petition was filed on Jason's behalf. As amended, it alleges that Father placed Jason's half-brother D. in a detrimental and endangering situation by shooting and killing a minor child in his presence. Father's conduct endangers Jason's health and safety and places him at risk of harm.[2] The court found a prima facie case for detaining Jason, who remained in the home of the PGPs. Father and Mother were authorized to have monitored visitation, though Father was incarcerated. Mother was ordered to have random drug tests. Father denied the allegations in the petition.

A jurisdiction report was received from DCFS on February 10, 2012. Jason continued to reside with the PGPs, where he has spent his whole life and receives excellent care. He is bonded to the PGPs, who want to provide him with a permanent home. When interviewed in jail, Father declined to discuss the shooting, saying only that he did not put Jason in a dangerous situation. Father opposed reunification services for Mother because she has no interest in her son and uses drugs. He would like the PGPs to become legal guardians or adopt Jason.

Mother indicated that she last used drugs, specifically marijuana, one month earlier; however, she tested positive for methamphetamines and alcohol on January 24, 2012. She is on probation in two cases for petty theft and having an open alcohol container in a car. She denied domestic violence with Father. During her interview, Mother's speech was slurred and she was difficult to understand. She did not visit Jason because she failed to complete court-ordered programs in the first DCFS proceeding. She said, "I didn't think I was a fit parent, now I'm stable." She began using drugs when she was 16 or 17. She was going to start parenting classes. Mother wished to have Jason placed with her, although she has never had unmonitored visitation with

---

**2** The amended petition alleges that Mother has a history of substance abuse and tested positive for alcohol and methamphetamines on January 24, 2012.

Jason and has not seen the boy since he was three or four months old. She acknowledged that Jason does not consider her to be his mother.

Elizabeth was interviewed and stated that she saw Father shoot F.R. "in front of my son and me," referring to D. She denied knowing Father's intentions and indicated that Father forced her to call F. out of his house, so he could shoot the boy. She described Father as "very jealous and violent"; he threatened to take D. away and give him up for adoption. She "has always been afraid" of Father, which is why she did not call police after the shooting. She feels safe in jail. D. was exposed to domestic violence in the family home.

The paternal grandmother (PGM) told DCFS that the family was in shock after the killing. As a youth, Father had hallucinations and put his head through a window: he was diagnosed with attention deficit disorder when he was 10 or 12 years old, and was diagnosed as bi-polar when he was 21. He is irritable and short-tempered, and was prescribed psychotropic medication, but does not use it. The PGM reported that Father and Elizabeth "have big arguments" that result in walls being punched. She disclosed that Father has a seven-month-old baby named Andres. Jason's mother has used drugs since age 16, and admitting using them during her pregnancy with Jason. Mother's drug usage is unresolved and she barely knows her own child.

The paternal grandfather (PGF) was shocked by Father's situation and the investigation. He wanted Father to take his medications, but as an adult, Father could refuse it. The PGF was unwilling to leave Jason with Father. Father and Elizabeth often argued in Jason's presence, but the PGPs would have them leave the house to prevent Jason from being exposed to domestic violence. The PGF stated that Mother has a long, unresolved addiction to drugs: when Mother resided at his home, the PGF "found a crystal methamphetamine pipe under the baby Jason's food."

Jason's maternal grandmother stated that Father was verbally and physically abusive to Mother, even hitting Mother when she was pregnant. She described him as a "bad person" with an explosive temper. She believed that Mother is no longer using drugs, while acknowledging that her daughter has a history of drug usage.

4

D.'s maternal grandmother stated that her daughter Elizabeth and Father came to her home after the shooting and seemed nervous. Elizabeth, crying, asked her to take care of D. forever. After her arrest, Elizabeth told her mother that Father forced her to lure F. out of home, then said, "I told you that you were going to pay for it" and shot him twice. Elizabeth described Father as aggressive, and her mother saw bruises on Elizabeth's arms, eye and legs.

Mother was drug testing: she had negative results on February 17, failed to appear on March 5, and tested positive for alcohol on March 21. Jason visited Father in jail and was confused because he could not have physical contact with Father. Mother's visits went well, although Jason "demonstrated resistance to the most recent visitation and is displaying acting out behaviors at school, including biting, on the days after each visit." The PGPs reported that Father began using marijuana at age 16 to "self-medicate" and avoid using prescribed psychotropic medications.

Jason was playful, energetic and joyful, and interacts positively with the PGPs. He has a strong attachment to them and accepts their parenting: they have been his primary caretakers since he was two days old. Hospital reports confirmed that Jason was exposed in utero to methamphetamine, and the PGPs believe that he was exposed to alcohol as well. Other concerns included the trauma of Father's arrest in Jason's presence; three lengthy police searches of the PGP's home; the handcuffing of the PGPs; and the removal of D. from the home.

The jurisdiction hearing was held on April 17, 2012. Father argued that the evidence shows only that he was arrested and there are no witness statements showing his connection with a crime. He asked the court to dismiss the allegations that he shot and killed F.R. because DCFS failed to show that Father caused the death. DCFS countered that Father was arrested for the murder of a 17-year-old victim, and Elizabeth told DCFS that Father committed the killing in front of her and D. She also told her mother that she was forced to lure F. out of the house, whereupon Father told him he would pay and shot him twice.

The court sustained the petition, finding that Father "allegedly" shot and killed a 17-year-old unrelated male in the presence of D., a crime for which Father was arrested. Father's commission of the "alleged" murder poses a substantial risk of harm to Jason and shows an inability to adequately supervise or protect Jason; further, Father caused the death of a child, thereby endangering Jason's safety. The court dismissed a count alleging that Father placed Jason's half-sibling in an endangering situation by shooting F. in D.'s presence. As to Mother, the court sustained an allegation that she has a history of substance abuse and currently abuses amphetamines and alcohol, as shown by a recent drug tests, which endangers Jason's physical and emotional health and safety.

DCFS asked the trial court to reconsider wording it added to the petition that Father "allegedly" shot and killed F.R. and the "alleged" murder endangers Jason. DCFS argued the wording compromised the court's jurisdictional finding, making it "unclear whether the court has found, by a preponderance of the evidence, that the father actually shot the minor, [F.]." DCFS asserted that it presented the court with sufficient evidence upon which to find that Father actually shot and killed F., placing Jason at risk of harm. Father contested the motion and asked the court to reconsider its ruling and "dismiss the petition."

At a hearing on June 22, 2012, the court granted the petition for reconsideration over Father's objections and removed the words "allegedly" and "alleged" from the sustained counts. The jurisdictional finding now reads that Father shot and killed F. and committed murder. At the same hearing, the court rendered its disposition. DCFS and Jason's attorney asked the court to deny reunification services because Father caused the death of a minor. Father argued that he has not been convicted and the court cannot deny reunification services simply because he is incarcerated.

The court declared Jason a dependent of the court and found that there is a substantial danger if he were returned to parental custody. The court ordered reunification services for Mother, requiring her to complete a drug rehabilitation program with random drug testing, and to complete individual counseling to address case issues. The court also ordered counseling for Jason, conjoint with Mother if his counselor finds it

6

appropriate. Mother was given monitored visitation, with DCFS having discretion to liberalize. Father was denied reunification services because he caused the death of a child. Father timely appeals from the disposition.

**DISCUSSION**

**1. Modification Order**

An order made by the dependency court "in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper." (§ 385.) Section 385 authorizes the court, without new evidence, to "reconsider the substance of a previous order the court considers to have been erroneously, inadvertently or improvidently granted." (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 116.) The power to modify a prior order is permitted by the state Constitution to ensure the orderly administration of justice, so long as there is notice and an opportunity to be heard. (*Id.* at pp. 116-117.) This Court recognizes the juvenile court's power to correct an erroneous ruling. (*In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1450.)

DCFS brought a motion for reconsideration, giving Father notice of its intention to ask the court to change its jurisdictional findings to remove the word "alleged." At the hearing, Father's attorney said, "If the court is going to reconsider, the court should dismiss" the allegations against Father. The court modified its prior order, over Father's objections. Father had notice and an opportunity to be heard, satisfying due process considerations. (*Nickolas F., supra,* 144 Cal.App.4th at pp. 117-118.) The juvenile court's modification "will not be disturbed on appeal absent a clear abuse of discretion." (*Id.* at pp. 118-119.)

Father maintains that the court erred when it modified its findings because "Nothing had changed. The [criminal] allegations were still allegations. 'Allegedly' and 'alleged' still applied." When making jurisdictional findings, the juvenile court does not address criminal culpability: "the standard of care and the burden of proof in dependency are lower than in a criminal proceeding." (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2012) 211 Cal.App.4th 13, 21.) It is not necessary to

7

secure a criminal conviction before making jurisdictional findings in a dependency case. (*In re Ethan C.* (2012) 54 Cal.4th 610, 630 (*Ethan C.*).) Section 300 allows the court "to adjudge a child a dependent if the court finds that the want of ordinary care by the child's parent or guardian caused another child's death." (*Ethan C.,* at pp. 617-618.) As a result, the juvenile court did not abuse its discretion by modifying its jurisdictional finding to state that Father "caused the death" of F.R., rather than finding that Father "allegedly" caused the boy's death.

## 2. **Sufficiency of the Evidence**

Father challenges the court's findings under section 300. "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and the disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

### a. *Dependency Jurisdiction Lies Regardless of Father's Claims of Error*

At the outset, we observe that "a jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of *either parent* bring her within one of the statutory definitions of a dependent." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397, italics added; *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16; *In re P.A.* (2007) 155 Cal.App.4th 1197, 1212.) Father concedes that Mother's substance abuse endangers Jason's physical and emotional health and safety under section 300. (AOB 27) As a result, "the court's exercise of jurisdiction over the child is appropriate." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1431.) Jason must be protected from Mother's behavior, regardless of Father's conduct, so dependency jurisdiction is proper.

b.  *Jurisdiction Lies Under Section 300(f)*[3]

Section 300(f) specifies that the juvenile court may exercise jurisdiction if "[t]he child's parent or guardian caused the death of another child through abuse or neglect." This subdivision was amended in 1996 to delete the requirement of a criminal conviction. (*Ethan C., supra,* 54 Cal.4th at pp. 629-630.)  Section 300(f) "merely refers to the death of 'another child,' and does not specify that the deceased child necessarily must have any family or custodial connection to the 'parent or guardian' who caused the death." (*Id.* at p. 636, fn. 18.)  Dependency jurisdiction is appropriate even if a parent's "lethal carelessness" does not necessarily amount to criminal behavior.  (*Id.* at p. 636.)  There need only be a "breach of ordinary care." (*Id*. at p. 637.)

"[T]he juvenile court may adjudicate dependency under section 300(f) without any additional evidence or finding that the circumstances surrounding the parent's or guardian's fatal negligence indicate a present risk of harm to surviving children in the parent's or guardian's custody." (*Ethan C., supra,* 54 Cal.4th at p. 618.)[4]  In *Ethan C.*, a father failed to secure his year-old daughter in a child seat before a car accident that was not his fault.  (*Ethan C.,* at p. 619.)  The juvenile court found that jurisdiction was proper under subdivisions (b) (due to parental domestic violence and cognitive impairments) and (f) (due to the child's death in the traffic accident).  (*Ethan C.,* at p. 621.)  The Supreme Court affirmed because "the father's negligent failure to secure his young daughter in a child safety seat was a substantial contributing cause of her death in an ensuing traffic accident." (*Id.* at p. 618.)

Certainly, if the negligently-caused death of a child in a traffic accident is a sufficient basis for establishing dependency jurisdiction under section 300(f) (as in *Ethan*

---

[3]     The use of letters following section 300 refers to applicable subdivisions.

[4]     "[P]rior to 1996, dependency jurisdiction under section 300(f) required the parent's or guardian's *criminal conviction* of causing another child's death.  The stated purposes of the 1996 revision were to eliminate the delay attendant on criminal proceedings, and to substitute a civil (preponderance of evidence) for a criminal (beyond reasonable doubt) standard of proof." (*Ethan C., supra,* 54 Cal.4th at p. 622.)

*C.*), the deliberate shooting of an unarmed minor during an argument indicates a present risk of harm to other children in the shooter's custody. "[I]t is '"[t]he enormity of a *death*"' of a child arising from parental inadequacy that invokes" dependency jurisdiction. (*Ethan C., supra,* 54 Cal.4th at p. 634.)

Substantial evidence supports the juvenile court's finding that Father caused the death of another child. In an interview with DCFS, an eyewitness, Elizabeth, stated that she saw Father shoot F.R. "in front of my son and me." She did not call police after the shooting because she is afraid of Father. Elizabeth's mother was interviewed and stated that Elizabeth and Father came to her home after the shooting and seemed nervous. Elizabeth asked her mother to take care of D. forever. After Elizabeth was arrested, she told her mother that Father forced her to lure F. out of his home, then shot him twice. Under a civil dependency standard, this evidence is sufficient to uphold a sustained allegation that Father caused the death of a 17-year-old child within the meaning of section 300(f).

   c. *Jurisdiction Under Section 300(a) and (b)*

As we have found, substantial evidence supports the juvenile court's finding that Father caused the death of a child under section 300(f). Father also challenges the sufficiency of the evidence underpinning the court's findings of jurisdiction pursuant to other subdivisions in section 300. His challenges need not be addressed.

A judgment will be upheld "if the evidence supports the decision *on any one of several grounds*[.]" (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875, italics added; *D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127.) Otherwise stated, "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor *if any one of the statutory bases* for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J., supra,* 56 Cal.4th at p. 773, italics added; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

10

If there is any basis for asserting jurisdiction, no reversal of the judgment occurs even if other bases are improper. (*Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72.) The purpose of the dependency proceeding is "to protect the child, rather than prosecute the parent." (*In re Alysha S., supra,* 51 Cal.App.4th at p. 397.) The courts are not concerned with each count alleged in the dependency petition: unlike a criminal prosecution, no prison sentence is meted out for each count. If evidence supports even one allegation of parental abuse or neglect, the courts must act to protect the child from harm and assert jurisdiction over the child. Given the gravity of the sustained section 300(f) allegation in this case, the court had to exert jurisdiction to protect Jason and ensure that Father undergoes all necessary counseling and treatment programs.

In any event, section 300(a) and (b) focus on whether there is a substantial risk that the child will suffer serious physical harm at the hands of his or her parent. There can be no doubt that Father is an extremely dangerous person. He refuses to take prescribed psychotropic medications and instead engages in "self-medication," according to his parents. He has a conviction for causing injury to Jason's mother, Irma J., and is reported to have hit Mother when she was pregnant with Jason. He had "big arguments" with Elizabeth inside the PGPs' house, that resulted in walls being punched. Father forced Elizabeth to lure her 17-year-old lover from his home, so that he could shoot the boy. Elizabeth described Father as violent and aggressive, and her mother observed bruises on Elizabeth's arms, eye and legs. Father committed the killing in front of his son D., who was sitting in the car and observed the incident. Father was arrested for murder in the presence of Jason and his brother. Father has abundantly demonstrated that he has no self-control, committed the most serious of crimes in front of his child, and poses a substantial risk to Jason.

## 3. Denial of Reunification Services

"[T]he general rule is that when a dependent child is removed from the parent's or guardian's physical custody . . . family reunification services, must be offered." (*Ethan C., supra,* 54 Cal.4th at p. 626.) Reunification services need not be provided in every case, however. (*Ibid.*) "Among the findings that will permit a denial of reunification

services is that 'the parent or guardian . . . has caused the death of another child through abuse or neglect.'" (*Ibid*.; § 361.5, subd. (b)(4).)

When parental misconduct has culminated in a death, the circumstances that justify removal of the children from parental custody also give rise to a presumption against reunification. (*Ethan C., supra,* 54 Cal.4th at p. 634.) A father who killed an unrelated child when both were minors may be denied reunification services during his adulthood. (*Mardardo F. v. Superior Court* (2008) 164 Cal.App.4th 481, 484, 489-490.) The juvenile court relied on Father's role in killing a child when it denied reunification services. This disposition is an appropriate exercise of the court's discretion because there is no evidence that reunification is in Jason's best interests.

Although Jason resides with the PGPs, Father had sole physical custody until the boy was detained when Father was arrested. Mother now wishes to take custody of Jason, claiming she has achieved sobriety and is a fit and stable parent. What will happen to Father and Mother remains to be seen. One thing is clear, however: the court had to remove Jason from parental custody and have DCFS oversee the child until a decision can be made that best suits his interests.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

BOREN, P.J.

We concur:

CHAVEZ, J.                    FERNS, J.*

_____

\*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.