Filed 9/4/14  In re B.D. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re B.D., a Person Coming Under the Juvenile Court Law. | B254776 (Los Angeles County Super. Ct. No. CK02592) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. S.D. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Carlos Vasquez, Judge.  Affirmed and remanded with directions.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant S.D.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant J.A.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant B.D.

John F. Krattli, County Counsel, Dawyn R. Harrison Assistant County Counsel, Denise M. Hippach, Deputy County Counsel for Plaintiff and Respondent.

## INTRODUCTION

Minor, B.D., along with his mother, J.A. (mother), and his father, S.D. (father),[1] appeal from the juvenile court's jurisdiction and disposition orders. Relying, inter alia, on the decision in *In re J.N.* (2010) 181 Cal.App.4th 1010 (*J.N.*), appellants argue that there was insufficient evidence to support the juvenile court's jurisdictional findings under Welfare and Institutions Code section 300, subdivision (b)[2] that mother and father posed a substantial risk of harm to B.D. based on their history of alcohol abuse and an incident during which mother drove under the influence, with B.D. in the car, and collided with a parked police car. Appellants further contend that because the Department of Children and Family Services (DCFS) failed to support the jurisdictional allegations with sufficient evidence, the disposition orders must be reversed.

We hold that, under the facts of this case, the evidence was sufficient to support the true finding on the allegation in paragraph b-1 of the petition that mother's conduct in driving while under the influence with B.D. in the car and colliding with a police car created a risk of harm to B.D. Because we affirm the jurisdiction order based on the true finding on that allegation against mother, we do not reach the appellants' contentions based on the other allegations in the petition concerning mother's and father's history of alcohol abuse.[3] Having affirmed the juvenile court's jurisdiction over B.D., we also affirm the disposition orders based thereon.

---

[1] B.D., mother, and father are sometimes collectively referred to as appellants.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3] See footnote 8, *post.*

2

# FACTUAL AND PROCEDURAL BACKGROUND

In a non-detention report, the Department of Children and Family Services (DCFS) informed the juvenile court of the following. On October 13, 2013, DCFS received a referral on its hotline reporting that mother, while driving under the influence of alcohol with B.D. and father in the car, collided with a parked police car. B.D. was taken by ambulance to the emergency room. Mother was arrested for driving under the influence of alcohol. DCFS then received a second referral during which the caller reported that father was extremely intoxicated on the night of the incident in question and, because mother appeared to be less intoxicated, father allowed mother to drive. In addition to being arrested for driving under the influence, mother was arrested for child endangerment.

In an interview with a children's social worker (CSW), mother explained that she "rear-ended a parked police car because she was drunk and did not see the police [car]." She was arrested and released on $100,000 bail. The arrest was her first.

In an initial interview with a CSW, father reported that he had a "little to drink" at his sister's birthday party so he asked mother, whom he believed to be more sober than he was, to drive home. Father "was surprised when . . . mother rear-ended a parked police [car]." Father told the CSW that he was not addicted to alcohol and that the collision was an "isolated incident."

In a subsequent follow-up interview with a CSW, mother explained that on the day of her arrest, she was visiting relatives and had been drinking beer continuously from 2:00 p.m. to 10:00 p.m., i.e., *for eight hours*, without eating anything.[4] Because B.D. had become "cranky and would not settle down," she decided to take him home to sleep. Mother believed she "was okay to drive." Mother described the accident as follows. "[As] she was driving [home,] she noticed a small light flashing in front of her and was

---

[4] As discussed below, mother told a deputy at the scene that she last ate at about 4:00 p.m. that day.

3

focused on the light as she approached closer [to it] and out of nowhere she hit a police car." "[T]he [police] car was parked in the middle of the street and there [were] no lights and she never saw it and hit [it] without having time to brake." Mother stated that she assumed full responsibility for her actions, was "very sorry" about the accident, and was "very thankful" no one was injured. Mother was enrolled in "AA meetings" and was willing to cooperate with DCFS. Mother appeared "very remorseful" and assured the CSW that the accident had been an "eye opener" and she would not drink and drive again.

The CSW also followed up with father who explained that, on the night of the accident, he had consumed "some beers" at a relative's home and did not believe he was sober enough to drive. But he believed mother was sober enough to drive. Just prior to the accident, father was turned facing the backseat tending to B.D. because the child was "cranky and crying." Father admitted to a prior conviction for driving under the influence of alcohol five years earlier.

Subsequent to the follow-up interview with mother, she called the CSW to report that the trial court in her criminal case had ordered her to wear a SCRAM (secure continuous remote alcohol monitoring) device on her ankle that would remotely monitor her alcohol consumption. She was also ordered to attend parenting classes and to continue to attend AA meetings.

On December 5, 2013, DCFS filed a Welfare and Institutions Code section 300 petition, asserting the following three allegations under subdivision (b). "b-1. The child [B.D.]'s parents [mother] and [father] placed the child in an endangering and detrimental situation in that the mother drove a vehicle with the child as a passenger in the vehicle, while under the influence of alcohol. On 10/12/13, the mother struck a parked law enforcement vehicle with the mother's vehicle. On 10/12/13, the mother was arrested and charged with Child Endangerment. Such an endangering and detrimental situation established for the child, by the mother, endangers the child's physical health and safety, placing the child at risk of physical harm, damage and danger." [¶] "b-2. The child [B.D.]'s mother is a current abuser of alcohol which renders the mother incapable of

4

providing the child with regular care and supervision. On 10/12/13, the mother was under the influence of alcohol, while the child was in the mother's care and supervision. On 10/12/13, the mother was arrested and charged with driving while under the influence of alcohol. The mother's alcohol abuse endangers the child's physical health and safety, placing the child at risk of physical harm, damage and danger." [¶] "b-3. The child [B.D.]'s father has a history of alcohol and is a current abuser of alcohol which renders the father incapable of providing the child with regular care and supervision. On 10/12/13, the father was under the influence of alcohol, while the child was in the father's care and supervision. On 10/12/13, the father was arrested and charged with [*sic*] Under the Influence of Alcohol above .08. The father has a criminal history of a conviction of driving while under the influence of alcohol .08 percent. The father's alcohol abuse endangers the child's physical health and safety, placing the child at risk of physical harm, damage and danger."

In February 2014, DCFS filed a jurisdiction/disposition report that provided the following information. A DCFS investigator asked mother to provide details about the accident. Mother explained that she attended a Saturday family gathering to celebrate the birthday of father's sister. Father was next door helping a neighbor with a home remodeling project. Mother drank a total of seven beers between 2:00 p.m. and 10:00 p.m., drinking about one beer an hour over that eight-hour period. When father finished working, he "opened a few drinks." At that point, mother knew she was the designated driver. She was "feeling fine," and was not tired like father who had been working all day. About 10:00 p.m., she and father decided to take B.D. home because he was "fussy." No one at the gathering tried to stop her from driving because no one thought she was drunk. During the drive home, father turned to tend to B.D., who had been "screaming the whole time." As a result, father did not see what happened. Mother took neighborhood streets to avoid the "busy main street." As she drove from a stop sign, she saw a light to her left, but "couldn't make it out." She "started to follow the light when the impact occurred." Father turned around and mother told him she had hit a police car. She was "shocked." A police officer asked her to step out of the car, and when she did,

he told her that her eyes were bloodshot. He asked mother if she had been drinking, and when she replied affirmatively, the officer told her that she had almost hit him. Mother performed field sobriety tests and then agreed to submit to a blood alcohol test at the police station. The results of the test showed that mother's blood alcohol concentration was either .15 or .17, the latter result being over twice the legal limit of .08. Mother informed the investigator that her car was a "total loss." The investigator included photographs of the damage to the front end of mother's car in the report.

Mother denied having a history of drug[5] or alcohol abuse. Mother, however, admitted to drinking alcohol "occasionally." Mother was adamant that father did not have a problem with drugs or alcohol, but admitted that he was too drunk to drive on the night of the accident and that he had a prior conviction as a minor[6] for driving under the influence of alcohol.

Mother informed the investigator that she was participating in a 52-week parenting class, AA meetings, and drug testing. She also wore the SCRAM ankle device for 51 days. Her SCRAM report confirmed that the device had not detected any alcohol consumption during that period

Father told the investigator that he did not abuse alcohol. He "might drink like three times a month, [a] little beer with dinner." Father admitted he had a prior conviction for driving under the influence of alcohol in 2009. At the time of that incident, he was 20-years-old, had been drinking beer, and driving "a street bike." He told the arresting officer that he "could have been killed driving a street bike [while under the influence of alcohol]." He completed all of his programs, including "AA meetings, MADD," community service, and all of the "DUI classes."

---

[5]    As discussed below, mother told the deputy at the scene of the accident that she was a regular marijuana user.

[6]    As discussed below, father was 20-years-old at the time of his prior conviction. DCFS also had a CLETS report showing that father had an arrest as a minor for being in possession of alcohol.

A Los Angeles County Deputy Sheriff wrote a report about the accident that provided the following information. The deputy responded to a report about a man with a gun in the 9800 block of Palm Street. While other deputies were conducting an investigation, the deputy used his marked black and white patrol vehicle to block westbound traffic on Palm Street by parking horizontally across the street. While his vehicle was parked, he observed a vehicle approaching his location. He used his flashlight to illuminate the vehicle and attract the driver's attention so the vehicle would stop. After several attempts to attract the driver's attention, the deputy realized the vehicle was not slowing. To avoid being struck by the approaching vehicle, the deputy ran from where he was standing in front of his vehicle. The oncoming vehicle then collided with his patrol vehicle. Upon contacting the driver—mother—the deputy observed that her eyes were watery and bloodshot and he smelled a strong odor of alcohol emitting from her breath and person. He detained mother, questioned her, and conducted field sobriety tests on her. Mother told the deputy that she saw the light he flashed at her, but did not know from where it was coming. Mother said she never saw the deputy's patrol vehicle. Mother also told the deputy that she felt "buzzed," had last eaten at 4:00 p.m., and, in addition to the Budweiser beers she had consumed, she had also used marijuana about six hours earlier, a drug that she regularly used. The deputy arrested mother for child endangerment and driving under the influence of alcohol. She submitted to a blood alcohol concentration test that showed her blood alcohol was either .15 or .17.

In a last minute information for the court, a CSW advised that mother was uncooperative, argumentative, and "difficult to work with." According to the CSW, mother continued to "make excuses for herself and father," citing work as an impediment to complying with programs such as random drug testing. As a result, the CSW recommended that further court supervision was needed for B.D.'s case.

At the jurisdiction/disposition hearing, the juvenile court sustained each allegation of the petition finding as follows: The Court: "The first thing that I wanted to address in this case is the characterization of this incident as being less egregious as the incident in

7

*In re J.N.*[*supra,* 181 Cal.App.4th 1010]. I know that all of these things can be subject to argument, but in this case what the court has before it is a situation where the police officer was parked at the location where the collision occurred. [¶] The officer indicated that he observed the vehicle approaching his patrol car. He states—the police officer writes: [¶] 'I used my handheld flashlight to illuminate the approaching vehicle to gain their attention so they would stop. After several attempts to gain the driver's attention by flashing my flashlight, I realized the vehicle was not slowing. [¶] So to avoid being struck by the vehicle, I ran from where I was standing in front of the vehicle. The vehicle then collided with my parked patrol vehicle.' [¶] The court does believe that this is a very serious situation, and whether or not it is more egregious than the situation in *In re J.N* may be arguable, but this is a situation where a police officer's safety was placed at risk because of the fact that the mother was driving intoxicated. [¶] So I just wanted to address that as—not only the police officer's safety but the child's safety obviously because the child was in the vehicle. So that—this is something that the court is taking into account. [¶] . . . [¶] But the court does see this situation—this particular case—as falling under the circumstances where the court should take jurisdiction and that is for the following reasons: The court does find that under the circumstances of this case where this very dangerous situation came about, the court is taking note of the interviews in the jurisdiction/disposition report given by the mother and father in this case. [¶] And with respect to [paragraph] b-1, the mother indicated that she had a few beers, a total of maybe seven, from 2:00 to 10:00 p.m. She was asked [if] at any time she felt intoxicated or impaired, and she stated 'no.' [¶] She indicated further during the interview that she knew after she saw [father] had finished working and he then opened a few drinks, she states, 'I knew then that I was going to be the designated driver.' [¶] She further goes on in response to the [DCFS's] investigator whether she felt too intoxicated or impaired to drive, and she stated 'no. I felt fine.' That—again, she reiterated again during the course of the interview that she did not feel intoxicated. And yet when—after she was arrested and she was tested for her blood alcohol content, her results were .15 and .17. That is troubling. [¶] This is not a case where the mother was just right above the legal limit.

8

This was almost twice the legal limit, and the mother indicated that she felt fine, that she didn't feel that there was a problem with her driving. That is troubling to the court, that somebody would be almost twice the legal limit and would have no clue that they shouldn't be driving. [¶] The—as to the father, he does have a conviction in 2009. He admitted that he had a conviction for a D.U.I. in 2009. Counsel arguing, well, that was on a bicycle. Well, nevertheless, that shows to the court that he does have a history of alcohol getting him into legal problems, and so he does have a history, and the court is taking that into consideration as well in this case. [¶] So the court does feel that b-1, b-2, and b-3 have been proved by a preponderance of the evidence in this case for the reasons indicated. It just—this is—under the circumstances that the court is taking into account in this case, the totality of the circumstances, the father's prior albeit minor run-in with the law, it is still alcohol-related. It is still a D.U.I. [¶] The mother's statements regarding her lack of awareness that she was at all intoxicated and that flies in the face of the blood alcohol results that were obtained and the very serious circumstances in this matter in which the child was exposed to have significant danger. There was a collision. A police officer's safety was placed at risk. The court does believe that in totality that the allegations in b-1, b-2, and b-3 have been proven."

Accordingly, the juvenile court declared B.D. a dependent of the court and placed him in the home of his parents under DCFS supervision. The juvenile court admonished both parents not to operate a motor vehicle while under the influence of alcohol. Mother was ordered to comply with all criminal court orders. The juvenile court also ordered DCFS to provide family preservation services for the parents and authorized unannounced visits by DCFS.

Mother, father, and B.D. appealed from the jurisdiction and disposition orders.

9

## A. Standard of Review

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193 [60 Cal.Rptr.2d 315].) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]."' [Citation.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321 [247 Cal.Rptr. 100].)' (See *In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198].)" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

## B. Analysis

### 1. Jurisdiction

When the evidence in support of the allegations in paragraph b-1 of the petition is viewed under the governing substantial evidence standard, it supports a reasonable inference that mother posed a significant risk of harm to B.D. As explained in *In re J.K.* (2009) 174 Cal.App.4th 1426, section 300, subdivision (b) provides that jurisdiction may be based on a prior incident of harm or a current or future risk. "The language of section 300, subdivisions (a), (b) and (d) is clear. All three subdivisions are satisfied by a showing that the minor *has suffered prior* serious physical harm or abuse. (§ 300, subds. (a) ['*The child has suffered, or* there is a substantial risk that the child will suffer, serious

physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.' (italics added)], (b) ['*The child has suffered, or* there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . .' (italics added)], (d) ['*The child has been sexually abused, or* there is a substantial risk that the child will be sexually abused . . . .' (italics added)].) In addition, the use of the disjunctive 'or' demonstrates that a showing of prior abuse and harm is sufficient, standing alone, to establish (fn. omitted) dependency jurisdiction under these subdivisions." (*In re J.K. supra,* 174 Cal.App.4th at pp. 1434-1435.) "We note, however, that at least with respect to section 300, subdivision (b), prior abuse and harm may be sufficient to support the *initial* exercise of jurisdiction, but '[t]he child shall *continue* to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness.' (Italics added.) We interpret this language to be consistent and in harmony with the first phrase of subdivision (b) and thus the use of the term 'continue' presupposes an initial exercise of jurisdiction either based on a prior incident of harm or a current or future risk." (*Id*. at p. 1435, fn. 5.)

As to paragraph b-1, appellants rely upon, inter alia, *J.N., supra,* 181 Cal.App.4th 1010, and argue that, just as *J.N.*, the facts of this case did not support a finding that mother posed a current risk to B.D. In *J.N., supra,* 181 Cal.App.4th 1010, the mother and the father of the minors became intoxicated at a restaurant, and the father then drove with his three children in the car. (*Id.* at pp. 1015-1017.) While driving, the father struck another vehicle and then sped away from the scene, only to lose control and crash into a traffic signal pole. (*Id.*) The children, two of whom were injured in the collision, were taken from the vehicle by the father, who attempted to flee the scene with them. (*Ibid.*) Both the father and the mother were agitated and uncooperative at the scene. (*Ibid.*) The father appeared too intoxicated to take a field sobriety test and could not follow directions for a preliminary screening breath test. (*Ibid.*) Blood tests showed his blood alcohol level to be .20. (*Ibid.*) Based on that evidence, the court in *J.N.* held that "[t]he evidence was not sufficient to establish that the children were at substantial risk of serious physical

11

injury as a result of parental inability to adequately supervise or protect the children. The evidence did not support a finding that each child was within the jurisdiction of the juvenile court under section 300, subdivision (b)." (*Id.* at p. 1027.)

According to appellants, the driving under the influence incident, including the collision with the parked police car, was an isolated incident. And, because there was no evidence that mother was an alcohol abuser and there was evidence that she realized the seriousness of her mistake and had completed most of the programs mandated in her criminal proceeding, a similar accident was not likely to happen again.

We conclude that the incident in question and the parents' subsequent conduct supported the juvenile court's finding of jurisdiction under paragraph b-1. Mother admitted that she drank alcohol "occasionally" and that, on the afternoon of the incident, she began drinking Budweiser beer at 2:00 p.m., all while B.D. was presumably under her care and supervision. She also admitted that she drank beer continuously over an eight-hour period. Although she said she had approximately one beer per hour during that period and estimated that her total consumption was approximately seven beers, her blood alcohol concentration after the accident was as high as .17—over twice the legal limit—a fact that suggests that mother had apparently understated significantly her alcohol consumption that day. At about 10:00 p.m., mother decided to drive home and, earlier in the evening, she knew she would be driving home because she observed father drinking after he finished working on the neighbor's remodel. Despite that knowledge, she continued to drink until just before the family left for home. Mother told a CSW that she "felt fine" just prior to driving, even though she told the deputy at the scene of the accident that she felt "buzzed." She also told him that, in addition to drinking continuously for eight hours, she had used marijuana at around 4:00 p.m. that day and that she was a regular marijuana user.

When the family left for home on the night of the incident, mother made a conscious decision to use side streets, and to avoid a busy main street, a decision that supports an inference that she was aware of her intoxication and wanted to avoid detection. On one of those side streets, she noticed a light to her left as she drove, but

12

was unable to determine from where it was coming. According to the deputy who was at the scene, he was signaling mother with his flashlight in an effort to make her stop but, after several such attempts, he was forced to run from his location in order to avoid being hit by mother's car. Without ever seeing the marked patrol car parked directly in front of her, mother crashed into it without braking. The damage to her car caused by the collision resulted in mother's insurance company declaring it a total loss and the photographs of her car taken after the accident showed extensive damage to the front end of her car.

Father admitted to a prior driving under the influence conviction based on an incident that, according to father, could have killed him. Nevertheless, one of the callers to the DCFS referral hotline reported that on the night of the incident in question, father was "extremely intoxicated" before the family left for home. Father, however, claimed that he had only had "a little to drink" and "some beers," while mother said he "opened a few drinks." Yet, despite the parents' efforts to downplay the level of father's intoxication, they each admitted that he was clearly too drunk to drive.

In addition to mother's efforts to downplay her own alcohol consumption on the night of the incident and her inconsistent statements about how intoxicated she felt, a CSW reported, just before the jurisdiction hearing, that mother was uncooperative, argumentative, difficult to work with, and making excuses for herself and father concerning participation in mandatory programs, such as random drug testing. As a result, that CSW recommended that further juvenile court supervision was needed for B.D.'s case. And, although mother's SCRAM report showed that she had not consumed alcohol during the 51 day period that she wore the SCRAM device, she still had not completed the required 52-week parenting class.

Based on all the evidence and an evaluation of credibility, the juvenile court reasonably could have inferred that mother and father had each tried to minimize the amount of alcohol they consumed on the day of the incident, as well as the frequency of their alcohol use. The juvenile court reasonably could also have inferred from the CSW's report of mother's excuse making and lack of cooperation that mother had not yet

13

accepted complete responsibility for her actions and did not yet fully comprehend the seriousness of the incident in question. When that evidence and those inferences are considered together with the evidence showing the seriousness of the incident—including that 22-month-old B.D. was in a vehicle driven by mother, who had a blood alcohol concentration approximately twice the legal limit, that almost ran over a deputy and crashed into a parked police car without braking, a police car that mother never saw despite repeated warning signals from the deputy that she needed to stop to avoid a collision—there was sufficient evidence to support the juvenile court's finding under paragraph b-1 that mother posed a substantial risk of harm to B.D.[7] As noted, our function is only to determine whether the juvenile court's finding is supported by substantial evidence, not to reweigh the evidence.

In addition to challenging the juvenile court's jurisdictional finding under paragraph b-1 of the petition, appellants also challenge the sufficiency of the evidence in support of the juvenile court's jurisdictional findings under paragraphs b-2 and b-3. Because we have affirmed the juvenile court's jurisdiction order under paragraph b-1, there is no need to reach the merits of those challenges.

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J., supra*, 56 Cal.4th at p. 773.; see *In re Drake M.* (2012) 211 Cal.App.4th 754, 762.) The court in *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491 to1492 discussed this principle as follows: "It is commonly said that the juvenile court takes jurisdiction over children, not parents. [Citations.] While this is not strictly correct, since the court exercises *personal*

---

**7**     To the extent our conclusion in this regard conflicts with the holding in *J.N., supra,* 181 Cal.App.4th 1010, we respectfully disagree with that opinion, given the specific facts of this case.

jurisdiction over the parents once proper notice has been given [citation], it captures the essence of dependency law.  The law's primary concern is the protection of children.  [Citation.]  The court asserts jurisdiction with respect to a child when one of the statutory prerequisites listed in section 300 has been demonstrated.  [Citation.]  The acquisition of personal jurisdiction over the parents through proper notice follows as a consequence of the court's assertion of dependency jurisdiction over their child.   [Footnote omitted.]  [Citations.]  Parental personal jurisdiction allows the court to enter binding orders adjudicating the parent's relationship to the child  [citation], but it is not a prerequisite for the court to proceed, so long as jurisdiction over the child has been established.  [Citation.]  Further, every parent has the option not to participate in the proceeding, even if properly noticed. [Citation.]  [¶]  As a result of this focus on the child, it is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child.  [Citations.]  Once the child is found to be endangered in the manner described by one of the subdivisions of section 300—e.g., a risk of serious physical harm (subds. (a) & (b)), serious emotional damage (subd. (c)), sexual or other abuse (subds. (d) & (e)), or abandonment (subd. (g)), among others—the child comes within the court's jurisdiction, even if the child was not in the physical custody of one or both parents at the time the jurisdictional events occurred.  [Citation.]  For jurisdictional purposes, it is irrelevant which parent created those circumstances.  A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established. [Citation.]  As a result, it is commonly said that a jurisdictional finding involving one parent is '"good against both.  More accurately, the minor is a dependent if the actions of either parent bring [him] within one of the statutory definitions of a dependent."'  [Citation.]  For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence.  [Citations]"

Under these authorities, the juvenile court's jurisdictional finding under paragraph b-1 against mother that we have affirmed was sufficient to support the juvenile court's

15

exercise of jurisdiction over B.D. Therefore, we elect not to address the propriety of the juvenile court's jurisdictional findings under paragraphs b-2 and b-3[8] because once the juvenile court obtained jurisdiction over B.D. for any of the reasons alleged in the petition, it had corollary jurisdiction over mother and father, after proper notice, to make orders affecting the welfare of B.D. (See *Los Angeles County Department of Children and Family Services v. Superior Court* (2012) 211 Cal.App.4th 13, 22 [having issued a writ to compel jurisdiction, court did not address remaining bases for jurisdiction alleged in the petition by DCFS].)

### 2. *Dispositional Order*

Appellants' challenges to the disposition orders are predicated primarily on their contention that the juvenile court's findings of jurisdiction lacked evidentiary support. They also contend that the orders for the parents to participate in family preservation and for unannounced home visits bore no relationship to the drunk driving incident that brought the matter to the attention of the juvenile court. They further contend that because the juvenile court did not order the parents not to consume alcohol, its findings that they each had a history of alcohol abuse were inconsistent.

Having affirmed the juvenile court's finding of jurisdiction under paragraph b-1, we affirm the disposition orders as based on a proper finding of jurisdiction and reasonably necessary to address the risk of harm posed by mother's conduct. As mother was still subject to a criminal case, the juvenile court could rely upon the orders in the criminal court. In light of the evidence of the parents' efforts to downplay the extent of their alcohol use, both on the day of the incident and in their daily lives, the juvenile court's disposition orders were based upon sufficient evidence.

---

[8] As to paragraph b-3, County Counsel concedes that there was no evidence to support the allegation that "On October 12, 2013, the father was arrested and charged with [*sic*] Under the Influence of Alcohol above .08." We therefore affirm the jurisdiction order based on the true finding on paragraph b-1 and remand the matter to the juvenile court with directions to strike the quoted sentence from paragraph b-3.

16

# DISPOSITION

The jurisdiction and disposition orders are affirmed, but the matter is remanded to the juvenile court with directions to strike from paragraph b-3 of the petition the following sentence: "On October 12, 2013, the father was arrested and charged with Under the Influence of Alcohol above .08."

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

KRIEGLER, J.