Filed 4/20/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re MIA Z. et al., Persons Coming Under the Juvenile Court Law. | B267041 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>DANIELA Z.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK05060) |

        APPEAL from orders of the Superior Court of Los Angeles County.
Carlos E. Vasquez, Judge.  Affirmed.

        Joseph T. Tavano, under appointment by the Court of Appeal, for Appellant.

        Office of the County Counsel, Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Respondent.

_____

The juvenile dependency court adjudged two minors to be dependents of the court. Appellant Daniela Z. (Mother) contends the court's jurisdiction orders are not supported by substantial evidence. We affirm.

## FACTS

### *Background*

Mother and Antonio V. (Father)[1] are the parents of three children: Destiny Z., born in July 2010, now deceased; Mia Z., born in October 2011; and Angel Z., born in February 2015. Sometime around spring 2014, Mother and Father began living apart, but maintained a relationship. Mother moved into an apartment with then three-year-old Destiny and two-year-old Mia.

At some point during the day on May 12, 2014, Destiny walked away from Mother's apartment and ended up about 120 feet away, in a well-trafficked alley fronting a commercial parking lot. While Destiny was standing in the alley, a heavy metal rolling gate at the access to the parking lot fell off its track and landed on Destiny, striking her in the head. Paramedics responded to the scene and transported Destiny to a local hospital, but doctors could not save her. Destiny was pronounced dead in the mid-afternoon.

### *The Los Angeles County Department of Children and Family Services (DCFS) Starts an Investigation*

On May 12, 2014, DCFS received an "Immediate Response" referral involving possible severe child neglect, apparently from hospital authorities. The reporting party informed DCFS that Destiny had been crushed to death by an iron gate after Mother had allowed her to be outside without adult supervision, and requested a risk assessment as to Mia. DCFS sent an emergency response social worker to Mother's address the same day, but no one was home.

---

[1]    Father is not a party to Mother's appeal.

2

On May 13, 2014, Los Angeles County Sheriff's Department Detective Toni Martinez called in a report to DCFS stating that Destiny's accident occurred in an alley in front of a commercial parking lot that was "very far" from Mother's residence. Further, Detective Martinez reported that video surveillance showed Destiny and two boys in the parking lot for several minutes before the accident. The boys began pushing and pulling on a black metal gate, and, while Destiny was out of the camera's view, the gate fell over into the alley where she was apparently standing. Beyond the details of the accident with the gate, the detective reported that the alley where Destiny had been playing was a high traffic area through which cars traveled at a high rate of speed. Detective Martinez stated that she was aware of a child neglect report involving the family in mid-September 2013 for leaving children unsupervised. Detective Martinez stated that it was her belief that Mother had a history of leaving her children unsupervised.

After speaking with Detective Martinez, the social worker visited the area where Destiny had been struck with the gate. The social worker noted that the location of the accident was at least 120 feet from Mother's residence in an upstairs apartment. A tenant in Mother's apartment complex, Denise D., told the social worker that the alley where Destiny was killed was very busy during the day and cars often passed through the alley at a high rate of speed. Denise D. said that on the day the gate fell on Destiny, she saw Destiny and two boys playing alone. When she heard Destiny's screams, Denise D. ran to the scene and tried to lift the gate from Destiny's body. Denise D. yelled for Mother's help, but it took Mother "some time" to arrive.

The social worker then went to Father's address where a tenant in his building (who wished to remain anonymous) reported that Mother, Destiny and Mia had moved out about a month earlier. The tenant had known the family for many years. He said there had always been concerns about the parents' lack of supervision of their children. The tenant explained that on a daily basis the children were observed by various tenants to be on the apartment balcony, in the hallways, on the sidewalk, or in the lobby alone and unsupervised. This typically occurred during daytime hours when Father was at work and Mother was home with Destiny and Mia. The tenant said he had talked to the

3

parents about the lack of supervision on more than one occasion. Mother would say things to the effect that she did not know how the children got out of her eyesight. The social worker learned that the building had several video cameras, and was shown a video taken in September 2013, when Mia and Destiny left the family apartment, went down the stairs, and exited through the lobby out onto the street. The tenant said he had several videos depicting the children wandering around the building unsupervised. When asked why he kept the videos, the tenant answered that he had almost hit Destiny with his car once when she "darted into the street." According to the tenant: "Her parents didn't know where she was or what had happened. But that was always the case. There were several times where the girls [were] in a situation where something tragic could have happened because their parents did not care."

On May 13, 2014, the social worker interviewed Mother and Mia at DCFS's Metro North Office. Mother stated that on the day Destiny was killed, she had allowed the child to play in the hallway with a boy who lived in the building, and, when she went to check on Destiny, she heard people outside yelling and calling her name. Mother said she ran downstairs into the alley and saw the gate on top of Destiny. Mother stated that only about "one minute" had elapsed between the time Destiny went out to the hallway and the time when Mother began hearing screams. Mother denied allowing her children to be outside without supervision. When the social worker told Mother there was a video showing the children walking out of the building unattended, Mother said she must have been right behind them.

***The Dependency Proceedings***

On May 16, 2014, DCFS filed a petition on Mia's behalf pursuant to Welfare and Institutions Code section 300,[2] subdivision (b) – failure to protect, subdivision (f) – causing death to a child's sibling, and subdivision (j) – abuse of sibling. Under all of the subdivisions, the petition alleged Mother's lack of parental supervision. At the time of the filing of the petition, DCFS submitted reports establishing the facts summarized

---

[2]     All further statutory references are to the Welfare and Institutions Code.

4

above. The dependency court detained Mia in foster care, ordered monitored visits for Mother and unmonitored visits for Father.[3]

In July 2014, DCFS submitted a jurisdiction/disposition report detailing further interviews with those involved in Mia's case. Detective Martinez said neither parent was taking responsibility for Destiny's death, and that Mother blamed the property owner for having a broken gate that fell on Destiny. Detective Martinez also reported that she had viewed a video from 2013 showing Destiny and Mia walking alone across a public street in what appeared to be a cul-de-sac toward a man working on a car who may have been Father. An anonymous reporter told DCFS that Destiny and Mia regularly would leave the apartment and go to the balcony, hallways, and the outside of the apartment building, and were often observed running around the building without supervision, diapers, or clothes. According to the reporter, a number of tenants had acted to protect the children when they were outdoors alone, and had confronted Mother about her lack of supervision.

Martin B., the parents' landlord, told DCFS that he often saw Destiny and Mia wandering around without supervision. He said Mother usually left her door open when the children were playing outside, but "the supervision was not there." He also said there were "many times" when he told Mother that both girls had gone into the apartment of a single male. Martin B. said that many tenants had brought to his attention the fact that the children were not being supervised. When asked how many times he saw that the children were not being supervised, Martin B. replied, "at least 20 times." He added that he once found the children on the fire escape stairs, which was extremely dangerous because the family lived on the third floor.

Tony B., who managed the family's apartment building until 2012, told DCFS he noticed the parents were not adequately supervising the children, which he brought to Mother's attention two or three times. He often saw Destiny at the top of the third floor staircase while mother was inside cooking with the door open. Tony B. described one

---

[3] On June 5, 2014, the court ordered monitored visits for Father. As noted above, Father is not involved in the current appeal.

incident where Destiny and Mia made it all the way to the emergency exit of the building, which had a large hole to the first floor. He took the children back to Mother's apartment and explained the risk that the girls could fall into the hole.

During the parents' further interviews, Mother denied ever placing the children at any risk, and claimed she was providing adequate care. She said that many of the children in the apartment complex played outside and other parents would supervise her children. Father said he and Mother had come to believe that Destiny's death was her "destiny," and added that accidents can "happen in a breeze and there are accidents that can't be prevented." Father stated that, regardless of what had happened, he knew that Mother was a "great mother," and that he "was grateful to having [*sic*] his children have such a great mother."

Mother and Father had enrolled in parenting classes. They had been arriving together to the Foster Family Agency for visits with Mia, although their visits were separate.

In November 2014, DCFS reported that Mother and Father had nearly completed a 20-session parenting class. They were also attending individual grief and loss counseling. Mia was participating in therapy on a weekly basis, and the parents attended consistently as collaterals and were receptive to the services offered to them.

In December 2014, the dependency court conducted a jurisdiction hearing over several days. Alfonso P. testified that he was the reporting party who had wanted to remain anonymous when he spoke with the social worker on May 13, 2014, the day after Destiny's death. Alfonso P. had been manager at Father's apartment building for the last two years. In May 2012, he had to run and grab Mia after she tripped and started rolling down the stairs of the building. On another occasion, he witnessed the children going up "the roof staircase" while no one was watching them. There had been "a few times" when he saw the children walking in the hallways with no supervision, including once when they were walking near the second floor stairs. Alfonso P. had watched a video where Mia and Destiny were crossing a dead-end street unaccompanied toward Father, who was fixing his car on the other side of the street.

6

Martin B., the owner of Father's apartment building, testified that he once saw Mia and Destiny unattended at the building's third floor fire escape, and had seen them wandering unsupervised around the complex more than five times. "More than a few times," he expressed his concern to the parents that the girls were not being supervised.

On December 18, 2014, the lawyers for the parties presented arguments to the dependency court. As to section 300, subdivision (f), Mia's appointed counsel argued that DCFS had failed to prove that Mother's failure to supervise Destiny was a "cause" of her death, and that the petition should be sustained under section 300, subdivision (b), but not subdivision (f). Mother's appointed counsel and Father's appointed counsel argued that the proceedings should be dismissed because Mia was not then, seven months after Destiny's death, at risk of harm. The dependency court sustained the section 300 petition under subdivisions (b), (f), and (j), and ordered DCFS to provide the parents with family reunification services. At the parents' request, the court continued proceedings for a contested disposition hearing.

In February 2015, DCFS filed a report indicating that Mother had completed the 20-session parenting class in November 2014, and Father had completed 17 of 20 sessions. The parents had been attending Mia's therapy appointments.

### The Second Petition

In February 2015, Mother gave birth to a new child, Angel Z., and DCFS filed an immediate section 300 petition on the child's behalf alleging that he was at risk of harm from Mother's inadequate parental supervision. The dependency court detained Angel. The court ordered DCFS to verify that Mother was not living with Father.

At a hearing in mid-February 2015, Mother's counsel informed the dependency court that Mother was not living with Father. In March 2015, DCFS filed a report indicating that, in late February 2015, Father had represented that Mother did not live at Father's apartment, but they were still in a relationship.

7

***The Disposition Hearing as to Mia, and Jurisdiction and Disposition as to Angel***

In March 2015, DCFS reported that Mother and Father arrived and left their visits with the children together. At a hearing on March 4, 2015, the dependency court ordered continued monitored visits for Father, and reminded him that he was not to act as monitor for Mother's visits. The court continued the proceedings to April 15, 2015.

In April 2015, DCFS reported that the social worker's voicemail had recorded a message from Father's cellular telephone on March 24, 2015. During the message, Mother could be heard telling Father that they needed to meet someplace where they were not known in order to prevent DCFS from asking anyone if they had been seen together. The social worker opined that Mother still lacked parenting skills, including an understanding of child development, and still did not recognize her accountability for her role in Destiny's death. Father seemed to minimize Mother's role in Destiny's death, was dependent on Mother, and focused on Mother's wishes instead of reunification with their children. The social worker believed Father would likely allow Mother to have unlimited access to their children.

On April 15, 2015, the dependency court adjudged Angel to be a dependent of the court under section 300, subdivisions (f) and (j). As to the issue of disposition of both children, Father's counsel argued that Father should be dismissed from the proceedings, and that the children should be released to Father's custody and care. Mother's counsel argued that the proceedings should be dismissed, and that the children should be returned to Mother. The children's counsel argued that Father should be dismissed from the proceedings, and that the children should be released to Father's custody and care.

The dependency court removed Mia and Angel from Mother's custody and care, and ordered them placed with Father. The court granted Mother monitored visits, on the condition that Father was not to monitor Mother's visits. The court ordered Mother to participate in counseling to address case issues.

Mother filed a timely notice of appeal.

**DISCUSSION**

**I.      Section 300, subdivision (f) — the Causation Issue**

Section 300, subdivision (f), authorizes the dependency court to take jurisdiction over a child when the evidence establishes that the child's parent "caused the death of another child through abuse or neglect." A finding of a current risk to a surviving child is not required. (See *In re Ethan C*. (2012) 54 Cal.4th 610, 637-639 (*Ethan C*.).) Subdivision (f) reflects the Legislature's apparent determination that a parent's "neglectful or abusive responsibility for a *child fatality* may *inherently* give rise to a serious concern for the current safety and welfare of living children under the parent's . . . care, and may thereby justify the juvenile court's intervention on their behalf without the need for separate evidence of findings about the current risk of such harm." (*Ethan C*., *supra*, 54 Cal.4th at p. 638.)

Mother contends the evidence is not sufficient to support the dependency court's jurisdictional finding under section 300, subdivision (f) because, while it undisputedly showed a lack of parental supervision at the time of Destiny's death, it did not show that this lack of parental supervision "caused" Destiny's death within the meaning of section 300, subdivision (f) in that it did not show that the lack of parental supervision was a "substantial factor" in causing the child's death. Here, Mother "submits that . . . Destiny would have been killed by the gate falling on her even if [Mother] was with her in the parking lot." Pressing this proposition further, Mother asserts that DCFS's case for dependency jurisdiction under subdivision (f) rested on a theory that Mother "should never have allowed Destiny to play in a busy commercial alley containing numerous potential dangers," but that this theory is flawed because it "presuppose[d] that it was obvious the metal gate would fall off its track, and there was no evidence presented to support that." We find Mother's causation-based argument unpersuasive.

9

A dependency court's jurisdictional findings are reviewed under the substantial evidence test. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.) Under this test, we resolve all conflicts in the evidence, and indulge all reasonable inferences that may be derived from the evidence, in favor of the court's findings. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

Mother's causation argument fails because it is based on a false predicate, namely, that jurisdiction under section 300, subdivision (f) must be viewed as based on Mother's neglectful parental supervision in that she "allowed Destiny to play in an alley" without any parental supervision. In actuality, Mother's neglect was that she allowed her three-year-old child to walk away unattended from the family home, thus exposing her to dangers of all kinds. That is, she did not keep an eye on her child at the family home in the first instance.

A parent's neglectful conduct may be found to have caused a child's death within the meaning of section 300, subdivision (f) under the following test, which appears to be borrowed largely from tort principles: "One's wrongful acts or omissions are a legal cause of injury if they were a substantial factor in bringing it about. [Citations.] If the actor's wrongful conduct operated concurrently with other contemporaneous forces to produce the harm, it is a substantial factor, and thus a legal cause, if the injury, or its full extent, would not have occurred but for that conduct. Conversely, if the injury would have occurred even if the actor had not acted wrongfully, his or her conduct generally cannot be deemed a substantial factor in the harm. [Citations.]" (*Ethan C.*, *supra*, 54 Cal.4th at p. 640.)

Here, the evidence supports a finding that, if Mother had not neglectfully allowed Destiny to walk away from the family home unattended, then she would not have been crushed to death by the falling gate. Mother's neglect in allowing Destiny to walk away from the family home unattended was a substantial factor, along with Destiny's own locomotion, and along with the children who pushed down the gate, in causing her death. Mother's argument that it was "not foreseeable that a child would be out playing and be crushed by a metal gate falling off its tracks" focuses too much on the end event causing

10

Destiny's death, and ignores that there may be multiple concurrent causes of an end event. (*Ethan C., supra*, 54 Cal.4th at p. 640.) Mother's causation argument fails because it overly focuses on the specific instrumentality of Destiny's death, the falling gate, and ignores that Mother's conduct put Destiny on the path to be in the place where that instrumentality was ultimately applied. In answering the question of what elements contributed to cause Destiny's death, it is appropriate to look at the entire chain of events leading to her death, not merely the final event directly causing her death. Here, the evidence in the record supports a finding that there was a causal connection between Mother's neglectful conduct and Destiny's death because, contrary to Mother's argument in her opening brief on appeal, we can indeed say that Destiny's death *would not have occurred* had Mother not neglectfully allowed Destiny to wander away from home. The evidence in the record supports a finding of factual, "but for," causation between Mother's negligent supervision and her daughter's death.[4]

The cases discussed in Mother's opening brief on appeal do not persuade us to reach a different conclusion. In *In re A.M.* (2010) 187 Cal.App.4th 1380, the Court of Appeal found the evidence was sufficient to support the dependency court's finding that a father caused the death of an infant by neglect. There, the evidence showed that father heard his infant child struggling to breathe, knew the child was not breathing normally, knew that a newborn lying on the stomach was at risk, and still took no action. (*Id*. at p. 1389.) Here, Mother argues her situation is different because the evidence did not show that she knew there was a danger in the alley. We reiterate that Mother's argument is not persuasive because it focuses too much on the end events in Destiny's death. It cannot be doubted that a parent knows that allowing a three-year-old child to roam

---

[4]    While she may not expressly say as much in her opening brief, we understand Mother to be proposing that, *at some point along a factual causation continuum*, a court should step in and rule — as a matter of law — that an end event is simply too remote to allow for a finding of causation. In other words, she wants us to find no "proximate causation" as a matter of law. We reject Mother's argument based on our reading of *Ethan C., supra*, 54 Cal.4th at page 640. The issue of causation within the meaning of subdivision (f) involves a determination whether a parent's conduct was a substantial factor, factually, in bringing about a child's death. Here, it was.

away from the family home unattended places the child at risk, including a risk of death. Taken to its logical conclusion, Mother's argument would posit that, had Destiny been hit by a car, there would be no causation because Mother did not know that a car would hit the child. We simply are not willing to accept such a proposition. The issue is not whether Mother knew the exact instrumentality that posed a risk to Destiny, but whether Mother should have appreciated the risk of death to which she exposed Destiny by letting her roam the streets unattended.

In *J.M. v. Superior Court* (2012) 205 Cal.App.4th 483, the Court of Appeal found the evidence was sufficient to support the dependency court's finding that a mother caused the death of her child. There, the evidence showed that mother lived in a culture of illegal drugs, permitted and used drugs in the family home in the presence of children, and failed to secure drugs to prevent children from having access to the drugs. Mother's conduct was a substantial factor in causing the child's death from ingesting narcotics. (*Id*. at p. 488.) Again, we do not view Mother's circumstances to be so different as to defeat causation. When Mother allowed Destiny to roam the streets unattended, she exposed her child to a risk at least as real as the parent in *J.M*. did by allowing her child to be exposed to dangerous drugs.

In *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2012) 211 Cal.App.4th 13, Division Three of our court granted a petition for writ of mandate upon finding that the dependency court erred in declining to take jurisdiction under section 300, subdivision (f). Division Three found that the evidence was sufficient to support a finding that a father caused the death of his child. There the evidence showed that, but for father's failure to seek immediate medical care for his 20-month-old daughter who had obvious effects of severe but treatable injuries, including bruises all over her body, the child would not have died. Here, as we have explained above, we find that, but for Mother allowing Destiny to roam the streets unattended, the child would not have died.

12

**II. Section 300, subdivision (b) — the Current Risk of Harm Issue**

Mother contends the evidence is insufficient to support the dependency court's jurisdictional findings under section 300, subdivision (b) because the evidence did not prove that Mia and Angel were at a "current risk of harm" as of the date of the jurisdictional decisions. Here, Mother argues that there was no evidence that Mia or Angel had suffered any harm leading up to the dates of the jurisdiction findings, and with the children with living with Father. In short, Mother asserts: "[T]here was no current risk that Mia or Angel would suffer harm by any lack of supervision by [Mother]."

Having found that the dependency court correctly exercised its jurisdiction under section 300, subdivision (f) we need not explore whether another ground for jurisdiction exists. Only one jurisdictional finding is required for the dependency court to assert jurisdiction over a child. (See *In re Ashley B.* (2011) 202 Cal.App.4th 968, 979 ["As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate"]; and see also *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112-113.)

**III. Section 300, subdivision (j) — Sibling Abuse**

Mother contends the evidence is insufficient to support the dependency court's jurisdictional finding under section 300, subdivision (j) because the evidence failed to show that the conduct which caused harm to Destiny was likely to reoccur as to Mia or Angel. We reiterate that, having found that the dependency court correctly exercised its jurisdiction under section 300, subdivision (f) we need not explore whether another ground for jurisdiction exists. (*In re Ashley B., supra,* 202 Cal.App.4th at p. 979; *In re Tracy Z., supra,* 195 Cal.App.3d at pp. 112-113.)

**IV. Disposition**

Mother argues: "Because the subsequent disposition orders flowed from the [dependency] court's finding of jurisdiction, the disposition orders should be reversed as well." Having ruled that the dependency court correctly exercised its jurisdiction under subdivision (f) we will not reverse the court's disposition orders.

13

## DISPOSITION

The dependency court's jurisdiction and disposition orders are affirmed.

**CERTIFIED FOR PUBLICATION**


BIGELOW, P.J.

We concur:


RUBIN, J.



FLIER, J.