Filed 12/21/21  A.F. v. Superior Court CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| A.F., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF KERN COUNTY, <br><br> Respondent; <br><br> KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Real Party in Interest. | F083341 <br><br> (Super. Ct. No. JD140853-00) <br><br><br> **OPINION** |

**THE COURT**<sup>*</sup>

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Marcos R. Camacho, Judge.

Vanji R. Unruh for Petitioner.

No appearance for Respondent.

Margo A. Raison, County Counsel, and Elizabeth M. Giesick, Deputy County Counsel, for Real Party in Interest.

---

<sup>*</sup>  Before Franson, Acting P. J., Peña, J. and Smith, J.

-ooOoo-

In September 2021, the juvenile court adjudged then five-year-old A.M. a dependent child under Welfare and Institutions Code section 300, subdivision (f)[1] (section 300(f)) and denied A.F. (mother) reunification services under section 361.5, subdivision (b)(4) after finding mother's neglect caused the death of her daughter, G.A. Mother seeks an extraordinary writ from the juvenile court's jurisdictional findings and dispositional orders, challenging the sufficiency of the evidence to support them. She also contends the juvenile court erred in denying her request for a bonding study. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

*The Death and Investigation*

On March 18, 2020, at approximately 5:45 a.m., detectives responded to a call at mother's apartment regarding a child not breathing. Mother's eight-year-old daughter, G.A. (the daughter), was lying on the living room floor receiving life-saving measures but was nonresponsive. She was taken by ambulance to the hospital where she was pronounced dead. She had multiple bruises and contusions as well as patterned abrasions/contusions of the head, torso, and upper and lower extremities. The coroner determined her death to be a homicide.

Mother worked midnight to 8:30 a.m. as an in-home care provider. Her boyfriend, Clint M., watched her children, the daughter, five-year-old son, G.A., and three-year-old son, A.M., while she worked. Mother and Clint began dating in 2015. Clint is A.M.'s father.

Mother told the detectives she left for work around 11:45 p.m. on March 17, 2021. The children were asleep on the couch in the living room. The daughter was conscious

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise noted.

2.

and " 'fine.' " Clint called mother during her shift to talk about his mother and sister coming to visit. She last spoke to him around 3:00 a.m., when he said he was going to sleep. Clint called her crying at approximately 5:34 a.m., and told her she needed to come home. There was something wrong with the daughter and she was not breathing. Mother hung up the phone and immediately left for home. She called 911 while driving home. While she was on the line with the dispatcher, the dispatcher attempted to contact Clint to have him start resuscitative efforts, but he did not answer his phone. When mother arrived at her apartment complex, she parked in the back and saw Clint run out of the apartment. He appeared scared and in a rush. He said, " 'I can't get in trouble for this. I don't think she's breathing' " and fled on foot.

Mother entered the apartment still on the phone with the dispatcher. She found the daughter upstairs in her bedroom on the floor. She was lying on her back and was cold to the touch. She had injuries that were not present the day before—a swollen upper lip and a bruised stomach. She was also not wearing the same clothes she was wearing when mother left for work. Mother carried her daughter downstairs to make it easier for the paramedics to render aid. Detectives found mother attempting cardiopulmonary resuscitation when they arrived. One of the detectives noted that the daughter had a purple bruise four- to six-inches in length, one inch in width on the left front area of her abdomen.

Mother told the detectives Clint had been in jail for a long time, used cocaine and marijuana and was an alcoholic. Because of an untreated leg injury, he walked with a limp and used a cane. Asked whether Clint had ever used physical discipline on the children, mother said she knew that he had but it occurred a long time ago and the children had not reported anything since. Mother did not want Clint physically disciplining the children because he was " 'heavy handed.' " They agreed he could make the children "run the stairs" but not spank them. "[R]unning the stairs" required the child to run up and down the apartment interior stairs sometimes with a backpack filled with

3.

water jugs. G.A. and A.M. told mother that Clint told the daughter to run the stairs and she refused. Clint then hit her with a "stick" and a belt.

Mother said Clint had a temper and had gotten physical with her, but she never reported it to law enforcement. Clint slapped and choked her, busted her lip, and hit her on the side of the head with a spray can.

G.A. described during a forensic interview seeing his sister hold water and stand against a wall. He demonstrated by holding both arms straight out to his sides. Clint who he referred to as "daddy" put "lots of water" in her backpack and made her run the stairs. When she cried, Clint " 'whopped' " her with a belt and a "stick." Her leg started bleeding and she died because " 'dad whopped her.' " He said only his dad whopped them and he got whopped because he peed himself or scratched. His mother had seen them get whopped and did not do anything. G.A. has eczema and scratched himself so vigorously during the interview that the interviewer had to terminate it.

Detectives located a camera within the residence and seized a belt and a cane. The daughter's original clothing was located in a dumpster behind the apartment complex and was seized by the police.

At the police station, mother told detectives she viewed video footage on her cellular telephone recorded from the internal residence camera that depicted Clint striking the daughter with a cane. She had saved four video files to her phone and allowed the detectives to watch some of the video footage. Clint could be seen striking the daughter several times using a two-handed overhead swing. It appeared the daughter positioned herself face-down on an ottoman in the living room prior to being struck. Each time Clint struck her, she fell to the floor. Mother consented to a forensic download of her phone and a search warrant was obtained for a forensic examination of the phone. Mother explained she installed the video camera system to monitor G.A. who scratched himself to the point of bleeding. By monitoring him, she and Clint were able to make him stop scratching.

4.

The detectives returned mother's phone to her and transported her home. They concluded from the video footage that she was not home at the time of the assault and ascertained that she did not have any history of reported abuse related to the children. However, they found three messages from mother to Clint on March 18, 2021, that they believed were of interest to the assault. At 12:30 a.m., mother sent a message that read, " 'Hello.' " At 12:37 a.m., she sent a message stating " 'Smh,' " which means "shaking my head." At 12:42 a.m., she sent a message stating " 'A bit much u think?' " There were nine calls between mother and Clint on March 18, 2021. One of the calls was placed by Clint at 12:46 a.m. The call lasted for two hours and 35 minutes.

Knowing that the assault occurred between 12:28 a.m. and 12:36 a.m., that mother was able to watch the residential camera remotely from her phone and began a phone call with Clint at 12:46 a.m., which lasted over two hours, and believing that her texts reference her reaction to viewing Clint assault the daughter, the detectives concluded it was plausible that she was aware of the assaults and had spoken to Clint about them.

Detective David Jordan was assigned to document the crime scene. He went to the hospital and observed the daughter's body. He noted her visible injuries in his report as follows: "[s]welling of the cheeks and lips, [n]umerous bruises of various sizes on all areas of her arms, legs and torso (in various stages of healing), [c]urve shaped bruise to her lower left abdomen, [m]ultiple curve shaped bruises to her buttocks and [s]trip bandages covering a bloody injury to her right shin."

*The Children Are Taken into Protective Custody*

The children were taken into protective custody on the morning of March 18, 2020, by the Kern County Department of Human Services (department). The following day, the department released G.A. into the custody of his father whose first and last initials are also G.A. (father). Father and mother had joint custody of the daughter and G.A. since October 2017. He had visits every other weekend and on holidays. He never saw welts or bruises on his daughter when she came to visit. If he asked her anything

5.

about her life with mother, she said she was not allowed to talk about anything that went on there.

*Clint's Arrest and Violent History*

On March 19, 2021, Clint was arrested in Inglewood. He confirmed he and mother spoke for several hours during her shift. Afterward, he checked on the daughter. She was " 'okay' " and he went to sleep. He checked on her again around 5:30 a.m., and found her unresponsive and cold. He called 911 but they were taking too long so he called mother instead. He was " 'freaked out' " and scared.

Clint claimed he tried to discipline the daughter by having her run the stairs or do push-ups and he finally gave up and made her shower and go to bed. He said he merely chastised her. He also claimed he may have hit her with the cane but was not sure because he blacked out. The daughter told him her legs hurt and she felt like she was going to vomit. She was wheezing and having trouble breathing and said she could not walk up the stairs, so he carried her upstairs, gave her an albuterol breathing treatment and put her to bed. He returned several hours later to check on her and noticed that she had blood clots in her eyes, her arms were cold, and her jaw was clenched. He threw her shirt away because every time she fell, he lifted her up by the shirt and it tore. There was also blood on her shirt and pants, but he did not know where the blood came from.

Nearly two hours into the interview, Clint stated, "I beat her ass and it probably went too far." " 'I f***** up. I couldn't take no more. I f***** up!' " He was charged with murder, child endangerment and torture.

Records revealed Clint's violent history. In November 2012, he strangled a paternal aunt and slapped her face, causing facial and neck injuries. In May 2015, he severely beat the mother of another one of his children to the point of unconsciousness. He grabbed her by her hair, dragged her off of a bus and repeatedly struck her face with his fists causing swelling and bruising to her eye, an injury to her nose and a laceration of her lip, which required emergency medical treatment and nine stitches. On prior

6.

occasions in 2015, Clint threatened to kill the mother of his other child. In 2015, the mother picked Clint up with her two young children in the car. Clint was heavily intoxicated and continued to drink alcohol in the car. He accused the mother of cheating on him and began hitting her while she was driving on the freeway with her children in the backseat. He threatened to kill her and then crashed the car into a pole along the freeway.

Mother had no reported history of child abuse or substance abuse.

*The Jurisdictional Allegations*

The department filed a petition, alleging A.M. came within the juvenile court's dependency jurisdiction under section 300, subdivisions (b) (failure to protect), (f) (causing the death of another child through abuse or neglect) and (j) (abuse of sibling). As a factual basis for the subdivision (b) and (f) counts, the petition alleged the daughter was beaten with a belt and a cane until she was unconscious and no longer breathing, that she had scarring, cuts, welts and bruising all over her body in different stages of healing, that mother was aware of Clint's violent history and allowed him to discipline her children. Under subdivision (j), the petition alleged that two of Clint's children were removed in 2014 and 2015. He was ordered to complete domestic violence counseling as a perpetrator and individual counseling in the first case. He was denied services in the second case and the child was in a permanent placement.

The juvenile court ordered A.M. detained and granted mother supervised visitation. The court denied her request to release A.M. to her custody. A jurisdictional/dispositional hearing (combined hearing) was scheduled for May 13, 2020. Meanwhile, the department developed a services plan that required mother to complete a 26-week child neglect class, a program in failure to protect from physical abuse and domestic violence as a victim.

The combined hearing was continued multiple times. In a report dated April 13, 2021, the department informed the court that A.M. was placed with a maternal relative

who was interested in legal guardianship. The department recommended the juvenile court sustain the petition and deny mother reunification services under section 361.5, subdivision (b)(4) because she caused the daughter's death through neglect and Clint under section 361.5, subdivision (e)(1) because he was incarcerated.

*Combined Hearing*

On May 27, 2021, the juvenile court convened the combined hearing and conducted the jurisdictional phase. Mother testified A.M. was living with her nephew. She denied causing the daughter's death. It was typical for her to talk to Clint by phone while she worked. She had no reason during her phone conversation on March 18, 2020, with Clint to be concerned about the daughter. She denied talking about the daughter with him during their long phone conversation. When she left for work, her sons were asleep on the couch and the daughter was asleep in her room. She had one camera in her apartment. It was situated between her kitchen and living room. She had it for security purposes to make sure no one was in her home when she was out of town. She denied installing it to make sure her children were safe while with Clint. She has an application on her cellular phone that allowed her to view the last 24 hours of video from the camera. It did not save the footage because she did not pay for that feature. She first looked at her phone while in the waiting room at the police station. She saw that Clint hit the daughter twice with the cane. She screen recorded it for the detectives.

Mother was not supposed to talk on her phone while at work but did. She only checked it when it rang. She got alerts on her phone when the camera picked up noise or motion, but she had her phone on silent or set to vibrate. She did not check her phone for notifications during the morning of March 18, 2020.

Mother denied that Clint ever slapped and choked her but said he busted her lip and hit her on the head with a spray can. That was the only time he physically assaulted her, and it was a long time ago when she was pregnant. She did not know about Clint's violence toward the mothers of his other children until she read about it in the

8.

department's reports. She did not allow Clint to discipline her children and did not put water bottles in a backpack and make them run up and down the stairs carrying it. She never beat her children and never saw Clint beat or whip them. When she told the police Clint was heavy handed, she meant that "he's a man. Why would [she] let him whip" her children. She also testified at Clint's preliminary hearing. She was no longer in a relationship with Clint, nor would she ever be.

As for her text message to Clint asking, " 'A bit much, ya think?,' " mother explained Clint was texting her about his sister coming in from Los Angeles. She responded to him, but he did not answer her. She perceived his silence as him having "an attitude" and asked whether it was a " 'bit much.' " She denied that her comment was in reference to Clint beating the daughter and had no idea at the time that Clint was beating her. She denied looking at any of the video while she was at work. She probably received notifications, but she did not look at them.

Mother completed 10 sessions of grief counseling, a 26-week counseling program for learning to protect, a 16-week nurturing parenting program, a 26-week child neglect program and was enrolled in a domestic violence class for victims. The court admitted certificates for "Learning to Protect" and "Nurturing, Parenting and Child Neglect."

The juvenile court continued the hearing and mother completed her testimony on July 16, 2021. Social worker Stephany Rosenow testified she thought it was possible mother was watching live while the daughter was beaten.

Lead detective, Sergeant Jared Diederich, testified mother was cooperative in the investigation. He believed mother may have viewed the assault via the camera in her apartment because she was texting Clint around that time and then spoke to him on the phone afterward. He intended to question her further at another time, but Clint's defense attorney questioned her about it at the preliminary hearing. Diederich decided questioning mother about the timing of her texts and the assault would not produce any useful evidence because the "element of surprise" was no longer there. He believed he

9.

had enough evidence to arrest mother, but he did not. He could not say with any certainty that she was watching while the daughter was beaten and killed.

Diederich believed mother was not completely truthful with him. He believed there was more physical abuse of her and potentially the children than she divulged. He believed there was a strong likelihood that she was aware the assaults were happening based on the evidence he found on her phone and information provided by Clint. To what degree, he did not know, but he believed she was aware. At one point, she told him she was unable to access the camera system because she said it was Clint's information. But it turned out she could access it. By the time Diederich was able to access the camera, 24 hours had elapsed and there was no more video to view. He could not say someone deliberately deleted the video.

Following Diederich's testimony, the parties closed their cases. The juvenile court amended the petition to delete portions of the section 300, subdivisions (b) and (f) allegations stating mother was aware of Clint's violent history with the mothers of his other children. The court admitted the video into evidence and continued the matter to August 3, 2021, for argument. The hearing was continued again until September 16, 2021.

*The Juvenile Court's Ruling*

On September 16, 2021, the juvenile court reopened the evidence to admit a monthly summary for the month of September 2021 from the child guidance clinic. The court sustained the allegations and denied mother reunification services as recommended.

As to whether mother was aware that Clint posed a danger that could result in injury, the juvenile court found that she did. The court did not find mother's testimony credible in terms of the extent of Clint's violence toward her and the children. She was initially candid in stating that he was heavy handed, meaning that he engaged in physical punishment that was beyond reasonable spanking. She later attempted to minimize his abuse by restating what she meant by heavy handed. The court did not find her

10.

explanation credible. The court also found the daughter was subjected to prior beatings based on the medical exam showing "substantial other injuries to the child that were in other various stages of healing." Mother would have been aware of those beatings yet allowed the children to stay with Clint. The court stated,

> "I think there is a nexus between what … mother knew about [Clint] in terms of how he treated her, how he treated the children, and a nexus that ties that behavior then to the possibility of him acting out and doing something that was substantially dangerous to the child. Unfortunately, in this case, what that meant was that it actually involved in the death of [the daughter]. Again, the question is not whether mother could have predicted what happened, it's whether there was substantial factors or red flags that were being [waved] at mother and she chose to ignore those red flags and proceed to allow the children to stay in [Clint's care]."

The juvenile court also found that mother knew about the daughter's injuries or death. The court did not find mother's testimony about the intended meaning of her texts credible. The court found it more believable that mother saw the beating but chose not to intervene and the daughter died of her injuries. Mother also failed to tell the police that the camera deleted any video from the prior 24 hours. By not telling them, law enforcement was not able to capture what happened.

As to disposition, mother's attorney argued it was in A.M.'s best interest to provide mother reunification services. A.M. was no longer in the care of his maternal relative but in foster care. Therefore, there was not a permanent plan for him. In addition, mother had one domestic violence class left to complete her case plan and regularly visited A.M. She asked the court to place A.M. in mother's custody with family maintenance services or provide her family reunification services.

The juvenile court ordered A.M. removed from parental custody and denied the parents reunification services as recommended. The court did not make any changes to the visitation order, denied mother's attorney's request for a bonding study, and set a section 366.26 hearing.

11.

**DISCUSSION**

*1.    There is Sufficient Evidence Mother's Neglect Was A Cause of the Daughter's Death*

Mother contends the juvenile court erred by concluding A.M. was subject to its jurisdiction under section 300(f) and that she was subject to reunification services bypass under section 361.5, subdivision (b)(4), all because there is insufficient evidence to support the court's finding her neglect was a cause of the daughter's death.  She argues there is insufficient evidence she failed to exercise ordinary care when she left the children in Clint's care and there was not a causal connection between her choice to leave them with him and the daughter's death.  She further argues there is no evidence she failed to seek medical care for the daughter.

The substantial evidence standard of review applies to the jurisdictional findings under section 300(f), and the reunification services bypass findings under section 361.5, subdivision (b)(4).  (*In re Mia Z.* (2016) 246 Cal.App.4th 883, 891 (*Mia Z.*); *In re Harmony B.* (2005) 125 Cal.App.4th 831, 843.)  "Under this test, we resolve all conflicts in the evidence, and indulge all reasonable inferences that may be derived from the evidence, in favor of the court's findings."  (*Mia Z.*, at p. 891.)

Section 300(f) provides a child may be adjudicated a dependent of the juvenile court where his or her "parent or guardian has caused the death of another child through abuse or neglect."  The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child comes under the juvenile court's jurisdiction.  (§ 355, subd. (a).)  Similarly, section 361.5, subdivision (b)(4) states reunification services need not be provided to a parent or guardian when the court finds, by clear and convincing evidence "[t]hat the parent or guardian of the child has caused the death of another child through abuse or neglect."

"Neglect" within the meaning of section 300(f) can be willful or negligent.  (*In re Ethan C.* (2012) 54 Cal.4th 610 (*Ethan C.*).)  Here, there was no evidence mother directly

12.

caused the injuries resulting in the daughter's death or that she intentionally meant to harm the daughter. In other words, there is no evidence mother caused the daughter's death by abuse or *willful* neglect. Thus, the narrow question before the juvenile court was whether mother's *negligent* neglect caused the daughter's death. In reviewing findings under section 300(f) where the allegation arises from negligence, courts apply principles of ordinary negligence and causation. (*Ethan C.*, *supra*, 54 Cal.4th at p. 637.) Negligence is a "breach of ordinary care"; criminal negligence is not required. (*Id*. at p. 637.) "One's wrongful acts or omissions are a legal cause of injury if they were a substantial factor in bringing it about. [Citations.] If the actor's wrongful conduct operated concurrently with other contemporaneous forces to produce the harm, it is a substantial factor, and thus a legal cause, if the injury, or its full extent, would not have occurred but for that conduct. Conversely, if the injury would have occurred even if the actor had not acted wrongfully, his or her conduct generally cannot be deemed a substantial factor in the harm." (*Id*. at p. 640.)

Mother contends she was exercising ordinary care when she left the children in Clint's care. She had no way of knowing that he would physically abuse them. The juvenile court, however, found that she did know based on the daughter's healing injuries and Clint's treatment of her and the children. The court cited the "medical exam" or autopsy as the source of the evidence that the daughter had "substantial" injuries that were in various stages of healing. While medical evidence of healing injuries would be compelling evidence mother knew her children were at risk of physical harm, there is no such evidence in the record. The autopsy report makes no mention of injuries that were in various stages of healing. That statement was made by the detective in observing the daughter's body at the hospital. It was adopted by the department and included as an allegation in the petition and as evidence in its reports. Nevertheless, other evidence of sufficient value, however, supports the court's finding mother was neglectful in leaving the children with Clint. She told the detectives Clint had a bad temper and was "heavy

13.

handed" in disciplining the children. She admitted he had been physical with her. He slapped and choked her, busted her lip, and threw a spray can at her head. Although she later backed away from her initial statements, the court did not find her credible. There was also evidence provided by G.A. that Clint "whopped" them and mother did not intervene.

Substantial evidence also supports the juvenile court's finding mother's neglect was the cause of the daughter's death. Had mother not left the daughter in Clint's care, she would not have been beaten and died. Further, a reasonable inference can be made from the timing and content of mother's texts to Clint and Clint's assault on the daughter that mother knew Clint was beating her and did not intervene. Had mother intervened at that time, the daughter may have survived the assault.

Mother cites several cases where reviewing courts have applied the principles of neglect and causation to uphold findings that a parent caused the death of a child. In *Ethan C.*, the California Supreme Court upheld a finding pursuant to section 300(f) where the appellant did not buckle a child into a child safety seat, and the child was killed in a car accident. (*Ethan C.*, *supra*, 54 Cal.4th at pp. 616–618.) In *Mia Z.*, a finding pursuant to section 300(f) was upheld where the appellant let the child wander 120 feet away from the apartment and a rolling gate in a commercial parking lot fell on her and killed her. (*Mia Z.*, *supra*, 246 Cal.App.4th at pp. 885, 894–895.) Mother also cites *In re A.M.* (2010) 187 Cal.App.4th 1380 where a father placed his six-day-old son in the bed with him, the child's mother and a sibling and then ignored the sound of the baby struggling to breathe. The baby died. The appellate court found sufficient evidence the father caused the baby's death under section 300(f). (*In re A.M.*, at pp. 1385–1389.) Although the facts surrounding the children's deaths are varied in these cases, they are not distinguishable in principle. In each case, as in mother's, a parent negligently subjected a child to danger that resulted in the child's death.

14.

*2.*     *The Juvenile Court Did Not Abuse Its Discretion in Denying a Bonding Study*

Mother contends the juvenile court's denial of a bonding study will preclude her from arguing the beneficial parent-child exception to adoption at the section 366.26 hearing. Therefore, it was error. We disagree.

A bonding study is an expert opinion on the relationship between the parent and child or between siblings. Such a study is not required prior to termination of parental rights. (*In re Lorenzo C*. (1997) 54 Cal.App.4th 1330, 1339.) The juvenile court is never required to appoint an expert when making a factual determination unless it determines "expert evidence is or may be required." (Evid. Code, § 730.) Thus, when there is extensive evidence in the record of the relationship between parent and child or between siblings, a bonding study is unnecessary. Absent a showing of clear abuse, the exercise of the court's discretion in granting or denying a request for a bonding study will not be overturned. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318−319; *In re Lorenzo C*., at p. 1339.)

As the court noted in *In re Richard C*. (1998) 68 Cal.App.4th 1191, there are practical reasons for the juvenile court to decline to order such expert advice:

> "Bonding studies after the termination of reunification services would frequently require delays in permanency planning. … The Legislature did not contemplate such last-minute efforts to put off permanent placement. [Citation.] While it is not beyond the juvenile court's discretion to order a bonding study late in the process under compelling circumstances, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes, and with due process." (*In re Richard C*., at p. 1197.)

From a parent's perspective, a bonding study could be valuable evidence for a parent seeking to establish the beneficial parent-child relationship exception to adoption under section 366.26, subdivision (c)(1)(B)(i). Under that exception, the parent must show that it would be detrimental to terminate parental rights because the parent

15.

maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.

Here, there was sufficient evidence on the record that mother regularly visited A.M. and that they had a strong bond. Consequently, there was no reason to delay permanency planning in favor of a bonding study that would not have provided any more useful information to the court than the observations of those who supervised the visits during the reunification period. As to the beneficial parent-child relationship exception, nothing precludes mother from arguing the exception based on the evidence in the record. We find no abuse of discretion.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).