Filed 12/23/22  In re Autumn G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re AUTUMN G. et al., Persons Coming Under the Juvenile Court Law. | B316536 (Los Angeles County Super. Ct. No. 21CCJP04304A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>JESSICA J.,<br><br>      Defendant and Appellant. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County, Tamara E. Hall, Judge.  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

Defendant and appellant Jessica J. (mother) challenges the juvenile court's exercise of dependency jurisdiction pursuant to Welfare and Institutions Code section 300[1] over her three children, Autumn G. (Autumn, born July 2005), Aiden G. (Aiden, born Apr. 2007), and Daniel J. (Daniel, born Aug. 2009).[2] Because the jurisdictional findings and orders are supported by substantial evidence, we affirm.

## BACKGROUND

I. *The Collision*

On the evening of August 22, 2021, following a party at a park to celebrate Daniel's birthday, mother drove her car with her boyfriend, Michael L. (Michael), Daniel, and Daniel's friend, 12-year-old Robert M. (Robert), as passengers. Mother's car

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] We refer to Autumn, Aiden, and Daniel, collectively, as minors. Raymond G. (Raymond) is Autumn and Aiden's presumed father. Daniel's father is unknown. Neither father is a party to this appeal.

2

collided with several parked cars.  Daniel and Robert sustained seat belt abrasions and complained of neck pain.

A California Highway Patrol (CHP) officer who responded to the scene of the collision "detected a very strong odor of an alcoholic beverage emitting from [mother's] breath and person" and noted that her "speech was slurred and fast."  Mother's eyes were watery and red and her gait was unsteady.  She denied that she had consumed alcohol prior to driving but was unable to perform a field sobriety test.  Mother was arrested for driving under the influence of alcohol.  (Veh. Code, § 23153, subd. (a).)

A test of mother's blood alcohol content subsequently returned at a level of 0.25 percent—"'well above' the legal drinking limit" to drive.[3]

## II. *Referral; DCFS's Initial Investigation*

The Los Angeles County Department of Children and Family Services (DCFS) received a referral regarding the collision, alleging severe neglect of Daniel, with Autumn and Aiden also at risk.  Based on the referral, a DCFS social worker conducted several interviews in early September 2021.

### A. CHP officer

According to the responding CHP officer, mother "was behaving 'up and down'" when she was transported to the hospital after the collision.  For example, she initially said that she would comply with giving a blood sample and rolled up her sleeves.  She then changed her mind, rolled her sleeves back down, and stated, "'You're going to have to fight me!'"

---

[3]     "It is unlawful for a person who has 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle."  (Veh. Code, § 23152, subd. (b).)

Robert and Daniel had given detailed statements regarding mother's drinking on the evening of the collision. Robert knew that mother and Michael had been consuming alcohol and that "mother was in no condition to drive." Both children reported "that mother and Michael were drinking out of 'Solo' plastic cups, as in trying to hide the fact that they were consuming alcohol in a public park."

B. Mother

Mother stated that the only alcohol she consumed on August 22, 2021, "was a 'few drinks' before heading out to the park" to celebrate Daniel's birthday. When asked to elaborate, she "state[d] that she actually only had one tall Michelada." Mother denied that she consumed any alcohol at the party and claimed that a problem with her car's power steering caused the collision.

Mother stated that she only consumed alcohol on special occasions and would have about two drinks on those days. She denied having any mental health issues but had been advised to seek therapy following the recent death of her sister.

C. Michael

According to mother's boyfriend, Michael, mother only drank one alcoholic beverage much earlier on the day of the collision. Michael denied that anyone had drunk alcohol at the park or that mother had been under the influence or had smelled of alcohol. He also denied that mother had any issues with alcoholism and or that she drank often. On days that mother drank, she would consume two or three drinks.

D. Daniel

Daniel denied that anyone, including mother, was drinking at the park. He denied feeling like mother was speeding or

4

driving recklessly. He reported that mother "only dr[ank] sometimes," consuming about one or two drinks. When asked if mother would drive after drinking, Daniel responded, "'not on most days.'"

E. Aiden

Aiden had left the party early with his grandparents, but he denied that mother had behaved like she was intoxicated. He stated that he had "never witnessed mother drinking to the point of stumbling, talking loudly, slurring her words, or changing any of her normal behaviors."

F. Autumn

Autumn had also left the party early with her grandparents and had not seen any alcohol at the park. Autumn reported that, on average, mother drank two times per month and had never driven under the influence.

G. Maternal grandmother

Minors' maternal grandmother had left the party a little early with Autumn and Aiden, but when she was there no one was consuming alcohol or behaving drunk. She denied that mother had any history of alcoholism or driving while under the influence.

H. Robert's mother

Robert's mother reported what she had learned from questioning her son about the collision. Robert had disclosed that he had seen cans or bottles of what he suspected to be beer at the party. Robert thought that mother and Michael were drunk and "that mother was not in any condition to be driving." Just before she hit the parked cars, mother was speeding.

III. *Removal Order*

On September 8, 2021, DCFS sought and was granted an order authorizing the removal of minors from mother. Minors were detained the next day and placed with maternal relatives.

IV. *Dependency Petition*

On September 13, 2021, DCFS filed a dependency petition seeking the juvenile court's exercise of jurisdiction over Daniel pursuant to section 300, subdivision (b)(1) (failure to protect), and over Autumn and Aiden pursuant to section 300, subdivisions (b)(1) and (j) (abuse of sibling). The identical b-1 and j-1 counts alleged that mother had placed Daniel "in a detrimental and endangering situation by driving a vehicle while under the influence of alcohol" with Daniel as a passenger. Mother's conduct also placed Daniel's siblings at risk of serious physical harm.

V. *Detention Hearing*

At the detention hearing on September 16, 2021, the juvenile court found that a prima facie showing had been made that minors were persons described by section 300 and that they were in substantial danger absent removal from mother. Mother was granted monitored visitation. Upon four consecutive clean tests, unmonitored visits would be permitted.

VI. *Jurisdiction / Disposition Report*

The jurisdiction/disposition report detailed additional interviews conducted by a DCFS dependency investigator in October 2021.

A. <u>Mother</u>

This time, mother admitted to drinking alcohol at the park on the day of the collision. She stated that she drank about four, 12-ounce beers and ate only a small meal. When asked if the

6

beers had made her intoxicated, mother responded, "'I would say so. I don't drink often. So [one] or [two], I would feel already kinda [*sic*] buzzed, I guess.'" She explained that she felt more tired than intoxicated. When she decided to drive, mother was not "'drunk, drunk'" but "did 'feel it.'" The dependency investigator told mother that her blood alcohol content was 0.25 percent, indicating that she had consumed about six alcoholic beverages before the collision. Mother was shocked it was so high and denied drinking that much.

Mother stated that she had begun drinking alcohol when she was 16 or 17 years old because of peer pressure. As to whether she believed that she had a drinking problem, mother responded, "'I don't. It's just been very hard lately. Just the passing of my sister. That's just something to get my mind off of that and everything else going on. I don't drink often.'" Mother claimed to never want to touch alcohol again.

Mother was enrolled in individual therapy, had completed a four-hour parenting course, and had been attending AA meetings for two months.

B. Autumn and Aiden's father

Raymond, Autumn and Aiden's presumed father, reported that there were lots of pictures of mother drinking with friends on social media.[4] When asked about mother's drinking when they were in a relationship, Raymond stated, "'It was mostly just drinking. We were drinking a lot. This was before the kids.'" After their children were born, "'[mother] was still drinking. Her mom would watch the kids a lot. She would drink, and she would get to the point where she was passing out. I took care of her a

---

[4] In October 2021, mother told the dependency investigator that she had not seen Raymond in 14 years.

7

lot. She would get to the point where she would just pass out somewhere. She would just drink a lot.'" Mother would also want to drive even though she was drunk.

Raymond believed that mother was still drinking a lot because she was drinking with the same friends that she had when she was younger.

C. <u>Michael</u>

Michael reported that mother had not drunk alcohol since her arrest. Prior to her recent sobriety, however, mother's alcohol consumption had increased following the death of her sister. She would drink to the point of getting drunk about two times per month. Michael and mother would usually wait until minors were asleep or with their grandparents to drink.

VII. *Adjudication Hearing*

The adjudication hearing was held on November 16, 2021. After entertaining oral argument,[5] the juvenile court sustained the dependency petition, declared minors dependents of the court, and removed them from mother's custody.

The juvenile court found Raymond's statements regarding mother's history of excessive drinking to be credible and that they spoke to a history that "led up" to the incident where mother placed the lives of two children—Daniel and Robert—as well as her own "in jeopardy." The court noted that mother "elected to drive a vehicle" with multiple passengers while her blood alcohol level was triple the legal limit, her speech slurred, her body emitting the odor of alcohol, her eyes bloodshot and watery, and her gait unsteady. The court found that mother had an "ongoing

---

[5] Counsel for minors joined mother's counsel in asking the juvenile court to dismiss the petition.

8

issue with alcohol and . . . excessive drinking" that continued to place minors "in harm's way."

Mother was ordered to submit to drug and alcohol testing and to complete a full drug and alcohol program with aftercare, a parenting class, and individual counseling. Mother was granted visitation with minors.

VIII. *Appeal*

Mother filed a timely notice of appeal from the jurisdictional findings and dispositional orders.

IX. *Subsequent Events*

At a six-month review hearing held on May 17, 2022, the juvenile court found that mother had made substantial progress and ordered minors returned to her custody. Minors remained under the court's jurisdiction.[6]

On November 15, 2022, the juvenile court found that the conditions which justified the initial assumption of jurisdiction under section 300 no longer existed and were not likely to exist if supervision was withdrawn. Accordingly, the court terminated its jurisdiction over minors. As to Autumn and Aiden, the court issued a juvenile custody order on November 28, 2022, which awarded mother sole legal and physical custody with monitored visits for their father, Raymond.[7]

---

[6] On May 31, 2022, mother filed a request asking us to take judicial notice of the juvenile court's May 17, 2022, minute orders. We granted the request on June 1, 2022. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

[7] On December 1, 2022, DCFS filed a status update letter informing us of the juvenile court's termination of jurisdiction. We take judicial notice of the documents attached to the letter, which consist of minute orders from November 15, 2022, and the

9

## DISCUSSION

As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. (See *In re Michelle M.* (1992) 8 Cal.App.4th 326, 330.) However, dismissal for mootness in such circumstances is not automatic, but "must be decided on a case-by-case basis." (*In re Kristin B.* (1986) 187 Cal.App.3d 596, 605.) An appeal should not be dismissed if, for example, the purported error could affect a parent in future proceedings. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1431–1432.)

In this appeal, mother challenges the juvenile court's initial exercise of dependency jurisdiction, contending that the evidence was insufficient to support the jurisdictional findings. In light of the court's November 15, 2022, order terminating jurisdiction, which occurred after appellate briefing was complete, mother's appeal is arguably moot. However, in an abundance of caution, we exercise our discretion to consider the merits of her appeal.

I. *Relevant Law*

Under section 300, subdivision (b)(1), the juvenile court has jurisdiction over and may adjudge to be a dependent of the court a "child [who] has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse."

Under section 300, subdivision (j), the juvenile court has jurisdiction over and may adjudge to be a dependent of the court

---

November 28, 2022, custody order. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

a child whose "sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."  In determining whether to exercise jurisdiction under subdivision (j), the court is required to "consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."  (§ 300, subd. (j).)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction.  The subdivision[] at issue here require[s] only a 'substantial risk' that the child will be abused or neglected.  The legislatively declared purpose . . . 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.)"  (*In re I.J.* (2013) 56 Cal.4th 766, 773; see also *In re K.B.* (2021) 59 Cal.App.5th 593, 603 ["The court need not wait for disaster to strike before asserting jurisdiction. [Citation.]  This is why the statute uses the word 'risk.'"].)

The existence of a substantial risk is a function of the likelihood of a particular harm and the magnitude of that harm.  Thus, "'[s]ome risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . .  [¶]  . . .  [¶]  . . . Conversely, a relatively high probability that a very minor harm will occur probably does

11

not involve a "substantial" risk. . . .'" (*In re I.J., supra,* 56 Cal.4th at p. 778.)

II. *Standard of review*

We review jurisdictional findings for substantial evidence. (*In re Mia Z.* (2016) 246 Cal.App.4th 883, 891.) Under this standard, "[w]e do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) "Substantial evidence may include inferences, so long as any such inferences are based on logic and reason and rest on the evidence." (*In re Madison S.* (2017) 15 Cal.App.5th 308, 318.)

III. *Analysis*

Mother chose to drive herself and three passengers, including two children, while she was under the obvious influence of alcohol. Her blood alcohol content was over three times the legal limit to drive (Veh. Code, § 23152, subd. (b)), and her significant state of intoxication was clearly observable—she emitted a strong odor of alcohol, her speech was slurred, her eyes were watery and red, and her gait was unsteady. As later reported by Robert, a 12-year-old passenger, it was apparent that mother was drunk and "not in any condition to be driving."

Mother's conduct did not just place Daniel at serious risk of physical harm; rather, actual harm ensued when she crashed the car, causing Daniel and Robert to suffer physical injuries. And, following the collision, mother displayed a concerning lack of candor about her drinking. (See *In re Gabriel K.* (2012)

12

203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].) She first denied that she had consumed any alcohol prior to driving. She later admitted to consuming alcohol but only before her arrival at the park. It was not until a subsequent interview that mother finally admitted to drinking alcohol at the park on the day of the collision. But even then, she minimized her state of intoxication.

Furthermore, mother's abuse of alcohol on the day of the collision was not an isolated incident but rather part of a longer history. Raymond reported that mother drank heavily—often to the point of passing out—when they had been in a relationship years earlier. According to Raymond, mother would want to drive despite her inebriated state. As to her more recent alcohol use, mother's boyfriend, Michael, reported that her alcohol consumption had increased following the death of her sister, and that mother would drink to the point of getting drunk about two times per month. Mother acknowledged that she had been experiencing a very difficult time with the death of her sister and that she drank to "'get [her] mind off of that and everything else going on.'"

Taken together, this constitutes ample substantial evidence that mother failed to adequately supervise or protect minors or that her substance abuse interfered with her ability to provide regular care for them, thus creating a substantial risk that minors would suffer serious physical harm. (§ 300, subd. (b)(1).)

Resisting this conclusion, mother relies heavily on *In re J.N.* (2010) 181 Cal.App.4th 1010. In that case, a juvenile court exercised dependency jurisdiction over three children after their father crashed his car while driving under the influence of alcohol, with the children and their mother, who was also

13

intoxicated, as passengers.  (*Id.* at pp. 1014–1015, 1021.)  The Court of Appeal reversed, concluding that "[d]espite the profound seriousness of the parents' endangering conduct on the one occasion in this case, there was no evidence from which to infer there [wa]s a substantial risk such behavior w[ould] recur."  (*Id.* at p. 1026.)  The Court of Appeal pointed to a lack of evidence that the parents had a substance-abuse problem or that their "parenting skills, general judgment, or understanding of the risks of inappropriate alcohol use [wa]s so materially deficient that [either] parent [wa]s unable 'to adequately supervise or protect' the children."  (*Ibid.*)

Mother contends that, with the exception of the juvenile court's finding that mother's history of alcohol abuse led up to the collision, "the instant case is on all fours with *In re J.N.*"  She argues that the juvenile court's finding regarding her history of alcohol abuse is flawed and should be disregarded because it was based on Raymond's statements about mother's conduct 14 years earlier and an inaccurate recitation of statements made by Michael.

For the reasons already discussed, however, substantial evidence supports the juvenile court's finding that mother's abuse of alcohol on the day of the collision was not an isolated event—a finding that distinguishes this case significantly from *In re J.N.*  Here, Raymond's statements indicated mother's longstanding problem with alcohol.  Even if that problem had abated in the 14 years since their relationship ended, other evidence indicated that it had reemerged and culminated in mother's egregious act of driving drunk with children as passengers on the evening of the collision.  And, even if the court misstated details of the record when explaining its ruling, """"a ruling or decision, itself

14

correct in law, will not be disturbed on appeal merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" [Citation.]' [Citation.]" (*In re L.K.* (2011) 199 Cal.App.4th 1438, 1448.)

## DISPOSITION

The jurisdictional findings and orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT

15